# INTERSTATE COMMERCE COMMISSION *v.* BRIMSON.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF ILLINOIS.

No. 883. Argued April 16, 1894. — Decided May 26, 1894.

The twelfth section of the Interstate Commerce Act authorizing the Circuit Courts of the United States to use their process in aid of inquiries before the Commission established by that·act, is not in conflict with the Constitution of the United States, as imposing on judicial tribunals duties not judicial in their nature.

A petition filed under that section in the Circuit Court of the United States against a witness, duly summoned to testify before the Commission, to compel him to testify or to produce books, documents, and papers re-

lating to the matter under investigation before that body, makes a case or controversy to which the judicial power of the United States extends.

As every citizen is bound to obey the law and to yield obedience to the constituted authorities acting within the law, the power conferred upon the Interstate Commerce Commission to require the attendance and testimony of witnesses and the production of books, papers, and documents relating to a matter under investigation by it, imposes upon any one summoned by that body to appear and testify the duty of appearing and testifying, and upon any one required to produce such books, papers, and documents the duty of producing them, if the testimony sought and the books, papers, etc., called for relate to the matter under investigation, if such matter is one which the Commission is legally entitled to investigate, and if the witness is not excused by the law on some personal ground from doing what the Commission requires at his hands.

Power given to Congress to regulate interstate commerce does not carry with it authority to destroy or impair those fundamental guarantees of personal rights that are recognized by the Constitution as inhering in the freedom of the citizen.

It was open to each of the defendants in this proceeding to contend before the Circuit Court that he was protected by the Constitution from making answer to the questions propounded to him or that he was not bound to produce the books, papers, etc., ordered to be produced, or that neither the questions propounded nor the books, papers, etc., called for related to the particular matter under investigation, nor to any matter which the Commission was entitled under the Constitution or laws to investigate. This issue being determined in their favor by the court below, the petition of the Commission could have been dismissed upon its merits.

*Hayburn's Case*, 2 Dall. 409; *United States* v. *Ferreira*, 13 How. 40; *Todd's Case*, 13 How. 52; *Gordon* v. *United States*, 117 U. S. 697; *In re Sanborn*, 148 U. S. 222, examined and distinguished.

The inquiry whether a witness before the Commission is bound to answer a particular question propounded to him, or to produce books, papers, etc., in his possession and called for by that body, is one that cannot be committed to a subordinate administrative or executive tribunal for *final* determination. Such a body could not, under our system of government, and consistently with due process of law, be invested with authority to compel obedience to its orders by a judgment of fine or imprisonment.

Except in the particular instances enumerated in the Constitution, and considered in *Anderson* v. *Dunn*, 6 Wheat. 204, and in *Kilbourn* v. *Thompson*, 103 U. S. 168, 190, of the exercise by either house of Congress of its right to punish disorderly behavior upon the part of its members, and to compel the attendance of witnesses, and the production of papers in election and impeachment cases, and in cases that may involve the existence of those bodies, the power to impose fine or imprisonment in order to compel the performance of a legal duty imposed by the United States can only be

exerted, under the law of the land, by a competent judicial tribunal having jurisdiction in the premises.

A proceeding under the twelfth section of the Interstate Commerce Act is not merely ancillary and advisory, nor is its object merely to obtain an opinion of the Circuit Court that would be without operation upon the rights of the parties. Any judgment rendered will be a final and indisputable basis of action as between the Commission and the defendant, and furnish a precedent for similar cases. The judgment is none the less one of a judicial tribunal dealing with questions judicial in their nature and presented in the customary forms of judicial proceedings, because its effect may be to aid an administrative or executive body in the performance of duties legally imposed upon it by Congress in execution of a power granted by the Constitution.

The issue made in such a case as this is not one for the determination of a jury, nor can any question of contempt arise until the issue of law in the Circuit Court is determined adversely to the defendants, and they refuse to obey, not the order of the Commission, but the final order of the court. In matters of contempt a jury is not required by due process of law.

The case is stated in the opinion.    See *post*, pages 456 to 468.

*Mr. Solicitor General* for appellant.    *Mr. Attorney General* and *Mr. George F. Edmunds* filed a brief for same.

*Mr. E. Parmalee Prentice*, (with whom were *Mr. J. C. Hutchins* and *Mr. C. S. Holt* on the brief,) for appellees.

I. This investigation was in its nature judicial, and authority to make it could not lawfully be conferred by Congress upon the Interstate Commerce Commission, which is in its nature an administrative and not a judicial body.

Whether Congress could create a judicial body charged with any or all of the duties that pertain to the Interstate Commerce Commission need not be considered. Those Commissioners are appointed for a term of years, and not during good behavior, as the Constitution requires for Federal judges. This question received most thorough and careful examination by Mr. Justice Jackson in *Kentucky Bridge Co.* v. *Louisville & Nashville Railroad*, 37 Fed. Rep. 567, 612, *et seq.*

The inquiry which the Commission was pursuing was judicial. We assert with entire confidence, that it is not one

of the constitutional means included in the power to regulate interstate commerce, to delegate to a non-judicial body the duty of inquiring whether such commerce "is carried on according to the requirements of law."   The proposition thus laid down by counsel is that Congress may authorize compulsory inquiry by a non-judicial body for the purpose of discovering and punishing past violations of law.   A more startling proposition has seldom been asserted in this court. These violations are, if anything, crimes, punishable by heavy penalties of fine and imprisonment, and the investigation of the question whether crime has been committed is not an administrative act within any possible construction of the language.   Such an inquiry is a function of the courts, with their historic appropriate machinery of the grand jury. Cooley, Const. Lim. (5th ed.) 109, 110.   See also *Commonwealth* v. *Jones*, 10 Bush, 725, where the Supreme Court of Kentucky held that the legislature even of a State, could not empower election boards to decide whether a citizen by dueling has forfeited his right to vote or hold office, since that determination involves a judicial question.   Authorities might be multiplied on this point, but we do not think it necessary.

That the inquiry in this case is judicial and only judicial, it seems impossible to doubt.   We are at a loss to know how counsel expects to make it appear otherwise.   Tried by any test with which we are familiar, the result is the same.   The language of the order entered by the Commission, and of the " informal complaints " on which that order was based, is susceptible of no other construction.   The wrong complained of was that the Illinois Steel Company, by means of the "switching roads " as the device, was violating the provisions of the Interstate Commerce Act by obtaining unjust preferences over other shippers.   The law makes one and only one provision in such a case, viz., the punishment of the persons responsible for such violation.

It is obvious that no special sanctity attaches to the name, the number, or the personality of the body in which this power is attempted to be lodged.   If Congress may authorize such inquiry by a commission of five distinguished citizens

appointed for a term of years, it may, under the same constitutional warrant, confer like power on a single individual for the entire country, or on a different individual for each State or county or railroad, or may attach it as a duty to an existing office, such as that of postmaster or United States marshal. It may thus constitute an indefinite number of irresponsible citizens into detectives, armed with inquisitorial authority and a roving commission. For the safety and liberty of the citizen, Congress ought not to have any such power. It is gratifying to discover that wherever the question has been presented, the courts have decided that it has no such power.

A clearer or more emphatic statement could hardly be made, than has been made by the Interstate Commerce Commission itself on this precise point. We should almost be willing to submit this branch of the case upon its annual report of the Commission for 1893.

Turning from principle to authority, we find discussion practically foreclosed by the vigorous and decisive opinion of Mr. Justice Field in *In re Pacific Railroad Commission,* 32 Fed. Rep. 241. The act creating that commission conferred power in terms as broad and as plausible as those of section 12 of the Interstate Commerce Act, directing an inquiry into the management of certain railroad companies and into the relations of the directors, officers, and employés of said companies with other concerns having contracts with the companies under investigation, and also whether the companies, or their officers or agents, had paid money or done anything else for the purpose of influencing legislation. These powers, like the powers attempted to be conferred on the Interstate Commerce Commission, contained two elements. Some of them were purely and offensively inquisitorial, searching into business which was wholly private. For the rest, the information sought could only be material as a foundation for subsequent judicial (*i.e.* criminal) proceedings. In the first part of his opinion Mr. Justice Field, with great power and unanswerable logic, demonstrates that this is a judicial inquiry; that the Commission is in no respect a judicial body, and that under our

system of government such a body cannot conduct such an inquiry.  He cites the decision of this court by Mr. Justice Miller in *Kilbourn* v. *Thompson*, 103 U. S. 168, and the case of *Boyd* v. *The United States*, 116 U. S. 616, which equally with the *Kilbourn case* in his language, is " a bulwark against the invasion of the right of the citizen to protection in his private affairs," adds, " the courts are open to the United States as they are to the private citizen, and both can there secure by regular proceeding, ample protection of all rights and interests which are entitled to protection under a government of a written constitution and laws."

II. Even if Congress could empower the Commission to make this investigation, still it could not empower the court to grant the order applied for ; because, whether the character of the inquiry is judicial or non-judicial, the question does not here arise in a case or controversy as required by the Constitution.

If this investigation by the Interstate Commerce Commission is other than judicial in its character, then by the very terms of its organization a judicial tribunal has no power over it.  But that it is a judicial inquiry we have sufficiently shown by argument and authority.  It remains to show that, as here presented, it is such an inquiry as does not fall within the constitutional province of this court.

The Federal Constitution provides that :  " The judicial power shall extend to all cases in law and equity arising under the Constitution, the laws of the United States and treaties made, or which shall be made under their authority, . . . to controversies to which the United States shall be a party, . . . etc."

The two clauses cited are the only ones under which, by any possible construction, the present application could fall. No power is granted except under the two categories of " cases " and " controversies."  It was early decided, and has never been seriously questioned, that these words not only express, but limit the judicial power of the United States, and that only " cases " and " controversies " can find an entrance into the Federal courts.  What these words mean, and

how strictly they define the power of the Federal judiciary may be seen from a few citations. Justice Field, in the case above cited, says:

"The term 'controversies,' if distinguishable at all from 'cases,' is in that it is less comprehensive than the latter, and includes only suits of a civil nature." Citing *Chisholm* v. *Georgia*, 2 Dall. 432.

What, then, are "cases"? Judge Story answers as follows: "Another inquiry may be, what constitutes a *case* within the meaning of this clause? It is clear that the judicial department is authorized to exercise jurisdiction to the full extent of the Constitution, laws, and treaties of the United States, whenever any question respecting them shall assume such a form that the judicial power is capable of acting upon it. When it has assumed such a form, it then becomes a case; and then, and not till then, the judicial power attaches to it. A case, then, in the sense of this clause of the Constitution, arises when some subject touching the Constitution, laws, or treaties of the United States is submitted to the courts by a party who asserts his rights in the form prescribed by law. In other words, a case is a suit in law or equity, instituted according to the regular course of judicial proceedings; and when it involves any question arising under the Constitution, laws, or treaties of the United States, it is within the judicial power confided to the Union." Story Const. § 1646.

In *Osborn* v. *Bank of the United States*, 9 Wheat. 738, 819, Chief Justice Marshall says: "This clause enables the judicial department to receive jurisdiction to the full extent of the Constitution, laws, and treaties of the United States, when any question respecting them shall assume such a form that the judicial power is capable of acting upon it. That power is capable of acting only when the subject is submitted to it by a party who asserts his rights in the form prescribed by law. It then becomes a case."

So, also, this court, by Mr. Justice Field, has compactly defined "cases and controversies" in the following language: "By those terms are intended the claims or contentions of litigants, brought before the courts for adjudication by regular

proceedings established for the protection or enforcement of rights, or the prevention, redress, or punishment of wrongs." *Smith* v. *Adams*, 130 U. S. 167, 173.

The courts have uniformly and repeatedly refused to recognize as "cases" or "controversies" questions arising at a preliminary stage before the judicial power is called into exercise, or subject to revision by another department after the courts have done with them. Under the first head falls *United States* v. *Ritchie*, 17 How. 525. The language of the act creating the California Land Claims Commission seems to be framed with a studious purpose of making the Commission an adjunct of the court, and provides *eo nomine* an "appeal" from its decision. This court decided that the Commission could only be supported at all by treating it as a purely administrative body, and that the so-called "appeal" was, in legal effect, the institution of a new suit, the judicial power being then for the first time invoked.

In *Ferreira's Case*, 13 How. 40, 45, the proceeding was held not to be a constitutional "case," because there was a similar discretion lodged in the Secretary of State after the court should have rendered its decision upon the validity of any given claim.

The precise objection here urged was recognized by Mr. Justice Gray, now of the United States Supreme Court, speaking as Chief Justice for the Supreme Court of Massachusetts, in the case of *Supervisors of Elections*, 114 Mass. 247. The Massachusetts constitution defined and limited very strictly the division of powers between the legislative, executive, and judicial departments. It was held by the Supreme Court that an act of the legislature, requiring the court on petition to appoint supervisors of elections, was unconstitutional, as imposing non-judicial duties upon the court. Judge Gray says: "These supervisors, although entrusted with a certain discretion in the performance of their duties, are strictly executive officers. They make no report or return to the court or any judge thereof. Their duties relate to no judicial suit or proceeding. . . . We are unanimously of the opinion that the power of appointing such officers cannot be con-

ferred upon the justices of this court without violating the constitution of the Commonwealth.   We cannot exercise this power as judges, because it is not a judicial function, nor as commissioners, because the constitution does not allow us to hold any such office."

This decision is not weakened in any way by the acts of Congress authorizing the Federal Judges to appoint supervisors of election.   The grounds of distinction pointed out by Judge Gray are unnecessary to be considered, since the Federal Constitution, article 2, section 2, clause 2, expressly authorizes Congress to " vest the appointment of such inferior officers as they shall think proper, in the President alone, in the courts of law, or in the heads of departments."   It is held by this court, in *Ex parte Siebold,* 100 U. S. 371, that the appointment of Federal supervisors by the courts is warranted by this clause of the Constitution.   The reasoning of Judge Gray in the Massachusetts case is strictly applicable here.

We come back finally to the proposition, which counsel does not state in terms, but which is involved in all of his argument, that any petition to a court, however non-judicial in form, asserting a right, however non-judicial in character, on one side, and an answer denying the right on the other, constitute a case or controversy, even though, as here, the denial is based upon the ground that there is no case or controversy.   But if every unfounded assertion of a right, in a non-judicial form, could make a " case," the whole constitutional limitation would be meaningless and void.   This will readily appear if we leave out of sight for a moment the congressional authority on which the asserted right is here supposed to be based, and test the question as between private parties.   A duty imposed by Congress has no higher sanctity than the obligations of a private contract.   Suppose, then, that some years ago a private individual had filed a petition, setting up that by contract a senator of the United States, upon good consideration, had agreed to make known to the petitioner the reasons which influenced the senator to support the Compromise of 1850, which agreement the senator was now refusing to perform, and praying that performance be

ordered by summary process, subject to the pains and penalties of contempt; and that the senator, being served with process or notice, had 'come into court and denied that the subject-matter of the application was a case or controversy within the Constitution. The situation would be in legal effect precisely what is said to exist in the case at bar — the right of petitioner to have the information asserted on the one side and denied on the other.

Does this make a case of judicial cognizance? Obviously not, for the reason that the court, looking into the subject-matter of the application, discovers that it is of a non-judicial character. But the right of the court to examine into the nature of the subject-matter is fatal to the argument in question. If a right, asserted on the one side and denied on the other, is judicial or otherwise according to the nature of the right, then it is idle to argue that the assertion and denial alone make a constitutional "case."

That the court will look at the nature of the right, and not merely at the form in which it is asserted, to determine whether there is or is not a "case" for judicial consideration, is abundantly settled by authority. See *Murray's Lessee* v. *Hoboken Land Co.*, 18 How. 282; *Ferreira's Case*, 13 How. 45; *Scott* v. *Neeley*, 140 U. S. 106; *Puterbaugh* v. *Smith*, 131 Illinois, 199; *Kilbourn* v. *Thompson*, 103 U. S. 168; *Langenberry* v. *Decker*, (Indiana,) 31 N. E. Rep. 190.

MR. JUSTICE HARLAN delivered the opinion of the court.

This appeal brings up for review a judgment rendered December 7, 1892, dismissing a petition filed in the Circuit Court of the United States on the 15th day of July, 1892, by the Interstate Commerce Commission under the act of Congress entitled "An act to regulate commerce," approved February 4, 1887, and amended by the acts of March 2, 1889, and February 10, 1891. 24 Stat. 379, c. 104; 25 Stat. 855, c. 382; 26 Stat. 743, c. 128; 1 Supp. Rev. Stat. 529, 684, 891.

The petition was based on the twelfth section of the act authorizing the Commission to invoke the aid of any court of

the United States in requiring the attendance and testimony of witnesses, and the production of documents, books, and papers.

The Circuit Court held that section to be unconstitutional and void, as imposing on the judicial tribunals of the United States duties that were not judicial in their nature. In the judgment of that court, this proceeding was not a case to which the judicial power of the United States extended. 53 Fed. Rep. 476, 480.

The provisions of the Interstate Commerce Act have no application to the transportation of passengers or property, or to the receiving, delivering, storing, or handling of property, wholly within one State and not shipped to a foreign country from any State or Territory, or from a foreign country to any State or Territory. But they are declared to be applicable to carriers engaged in the transportation of passengers or property wholly by railroad, or partly by railroad and partly by water when both are used, under a common control, management, or arrangement, for a continuous carriage or shipment from one State or Territory of the United States, or the District of Columbia, to any other State or Territory of the United States, or the District of Columbia, or from any place in the United States to an adjacent foreign country, or from any place in the United States through a foreign country to any other place in the United States, and also to the transportation in like manner of property shipped from any place in the United States to a foreign country and carried from such place to a port of transshipment, or shipped from a foreign country to any place in the United States and carried to such place from a port of entry either in the United States or an adjacent foreign country.

The term "railroad" as used in the act includes all bridges and ferries used or operated in connection with any railroad, and also all the road in use by any corporation operating a railroad, whether owned or operated under a contract, agreement, or lease; and the term "transportation" includes all instrumentalities of shipment or carriage.

All charges made for services rendered or to be rendered in

the transportation of passengers or property, as above stated, or in connection therewith, or for the receiving, delivering, storing, or handling of such property, are required to be reasonable and just; and every unjust and unreasonable charge for such service is prohibited and declared to be unlawful. § 1.

Any carrier subject to the provisions of the act, directly or indirectly, by special rate, rebate, drawback, or other device, charging, demanding, collecting, or receiving from any person or persons a greater or less compensation for services rendered or to be rendered in the transportation of passengers or property, than it charges, demands, collects, or receives for doing a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances and conditions, is to be deemed guilty of unjust discrimination, which the act expressly declares to be unlawful. § 2.

So it is made unlawful for any such carrier to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, or locality, or to any particular description of traffic, or to subject any particular person, company, firm, corporation, or locality, or any particular kind of traffic, to undue or unreasonable prejudice or disadvantage in any respect. And carriers subject to the provisions of the act are required to afford, according to their respective powers, all reasonable, proper, and equal facilities for the interchange of traffic between their respective lines, and for the receiving, forwarding, and delivering of passengers and property to and from their several lines and those connecting therewith, and not to discriminate in their rates and charges between such connecting lines; but this regulation does not require a carrier to give the use of its tracks or terminal facilities to another carrier engaged in like business. § 3.

It is made unlawful for any carrier subject to the provisions of the act to charge or receive any greater compensation in the aggregate for the transportation of passengers or of like kind of property under substantially similar circumstances and con-

ditions, for a shorter than for a longer distance over the same line, in the same direction, the shorter being included within the longer distance; but this does not authorize the charging and receiving as great compensation for a short as for a longer distance. Upon application to the Commission, the carrier may in special cases after investigation by that body, be authorized to charge less for longer than for short distances for the transportation of passengers or property; and the Commission may from time to time prescribe the extent to which the carrier may be relieved from the operation of this section. § 4.

It is also made unlawful for any carrier subject to the provisions of the act to enter into any contract, agreement, or combination with any other carrier or carriers for the pooling of freights of different and competing railroads, or to divide between them the aggregate or net proceeds of the earnings of such railroads, or any portion thereof; and in any case of an agreement for the pooling of freights as aforesaid each day of its continuance is deemed a separate offence. § 5.

Another section of the act provides for the printing and posting by carriers of their rates, fares, and charges for the transportation of passengers and property, including terminal charges, classifications of freight, and any rules or regulations affecting such rates, fares, and .charges, including the rates established and charged for freight received in this country to be carried through a foreign country to any place in the United States; forbids any advance or reduction in such rates, fares, and charges, so established and published, except upon public notice, of which changes the Commission shall be notified; requires every carrier to file with the Commission copies of all contracts, agreements, or arrangements with other carriers relating to any traffic affected by the provisions of the act, as well as copies of schedules of joint tariffs of rates, fares, or charges for passengers and property over continuous lines or routes operated by more than one carrier; declares it to be unlawful for any carrier, party to any joint tariff, to charge, demand, collect, or receive from any person or persons a greater or less compensation for the transportation of

persons or property, or for any services in connection there-with between any points as to which a joint rate, fare, or charge is named thereon than is specified in the schedule filed with the Commission in force at the time; authorizes in addition to the penalties prescribed for neglect or refusal to file or publish rates, fares, and charges, a writ of mandamus to be issued by any Circuit Court of the United States in the judicial district wherein the principal office of the carrier is situated, or wherein such offence may be committed, and if such carrier be a foreign corporation, in the judicial circuit wherein it accepts traffic, and has an agent to perform such service, to compel compliance with the above provisions of the section relating to schedules of rates, fares, and charges — such writ to issue in the name of the people of the United States, at the relation of the commissioners appointed under the provisions of the act, and the failure to comply with its requirements being punishable as and for a contempt; and empowers the commissioners, as complainants, to apply, in any such Circuit Court of the United States, for a writ of injunction against the carrier, to restrain it from receiving or transporting property among the several States and Terri-tories of the United States, or between the United States and adjacent foreign countries, or between ports of transshipment and of entry and the several States and Territories of the United States, as mentioned in the first section of the act, until the carrier shall have complied with the provisions last referred to. § 6.

So a common carrier subject to the provisions of the act is forbidden to enter into any combination, contract, or agree-ment, expressed or implied, to prevent by change of time schedule, carriage in different cars, or by other means or devices, the carriage of freights from being continuous from the place of shipment to the place of destination; and no break of bulk, stoppage, or interruption made by such com-mon carrier shall prevent the carriage of freights from being, and being treated, as one continuous carriage from the place of shipment to the place of destination, unless such break, stoppage, or interruption was made in good faith for some

necessary purpose, and without any intent to avoid or unnecessarily interrupt such continuous carriage or to evade any of the provisions of the act. § 7.

By the eleventh section a commission is created and established, to be known as the Interstate Commerce Commission, and to be composed of five commissioners, appointed by the President, by and with the advice and consent of the Senate. § 11.

Other sections give a right of action to the persons injured by the acts of carriers done in violation of the statute; prescribe penalties against carriers for illegal exactions and discriminations; and indicate how the provisions of the statute may be enforced against carriers by the Commission.

The twelfth section, 26 Stat. 743, c. 128, the validity of certain parts of which is involved in this proceeding, provides as follows: "That the Commission hereby created shall have authority to inquire into the management of the business of all common carriers subject to the provisions of this act, and shall keep itself informed as to the manner and method in which the same is conducted, and shall have the right to obtain from such common carriers full and complete information necessary to enable the Commission to perform the duties and carry out the objects for which it was created; and the Commission is hereby authorized and required to execute and enforce the provisions of this act; and, upon the request of the Commission, it shall be the duty of any district attorney of the United States to whom the Commission may apply to institute in the proper court and to prosecute under the direction of the Attorney General of the United States all necessary proceedings for the enforcement of the provisions of this act and for the punishment of all violations thereof, and the costs and expenses of such prosecution shall be paid out of the appropriation for the expenses of the courts of the United States; and for the purposes of this act the Commission shall have power to require, by subpœna, the attendance and testimony of witnesses and the production of all books, papers, tariffs, contracts, agreements, and documents relating to any matter under investigation.

" Such attendance of witnesses and the production of such documentary evidence, may be required from any place in the United States, at any designated place of hearing. And in case of disobedience to a subpœna the Commission, or any party to a proceeding before the Commission, may invoke the aid of any court of the United States in requiring the attendance and testimony of witnesses and the production of books, papers, and documents under the provisions of this section.

" And any of the Circuit Courts of the United States within the jurisdiction of which such inquiry is carried on may, in case of contumacy or refusal to obey a subpœna issued to any common carrier subject to the provisions of this act, or other person, issue an order requiring such common carrier or other person to appear before said Commission (and produce books and papers if so ordered) and give evidence touching the matter in question ; and any failure to obey such order of the court may be punished by such court as a contempt thereof. The claim that any such testimony or evidence may tend to criminate the person giving such evidence shall not excuse such witness from testifying ; but such evidence or testimony shall not be used against such person on the trial of any criminal proceeding.

" The testimony of any witness may be taken, at the instance of a party, in any proceeding or investigation depending before the Commission, by deposition, at any time after a cause or proceeding is at issue on petition and answer. The Commission may also order testimony to be taken by deposition in any proceeding or investigation pending before it, at any stage of such proceeding or investigation. Such depositions may be taken before any judge of any court of the United States, or any commissioner of a circuit, or any clerk of a District or Circuit Court, or any chancellor, justice, or judge of a Supreme or Superior Court, mayor or chief magistrate of a city, judge of a county court, or court of common pleas of any of the United States, or any notary public, not being of counsel or attorney to either of the parties, nor interested in the event of the proceeding or investigation. Reasonable notice must first be given in writing by the party or his attorney proposing to

take such deposition to the opposite party or his attorney of record, as either may be nearest, which notice shall state the name of the witness and the time and place of the taking of his deposition. Any person may be compelled to appear and depose, and to produce documentary evidence, in the same manner as witnesses may be compelled to appear and testify and produce documentary evidence before the Commission as hereinbefore provided.

"Every person deposing as herein provided shall be cautioned and sworn (or affirm, if he so request) to testify the whole truth, and shall be carefully examined. His testimony shall be reduced to writing by the magistrate taking the deposition, or under his direction, and shall, after it has been reduced to writing, be subscribed by the deponent.

"If a witness whose testimony may be desired to be taken by deposition be in a foreign country, the deposition may be taken before an officer or person designated by the Commission, or agreed upon by the parties by stipulation in writing to be filed with Commission. All depositions must be promptly filed with the Commission.

"Witnesses whose depositions are taken pursuant to this act, and the magistrate or other officer taking the same, shall severally be entitled to the same fees as are paid for like services in the courts of the United States." § 12.

The nature of the present proceeding, instituted pursuant to the authority conferred by that section, will appear from the following summary of the pleadings and orders in the cause :

Prior to the 14th of June, 1892, informal complaint was made to the Interstate Commerce Commission, under the provisions of the Interstate Commerce Act, that the Illinois Steel Company, a corporation of Illinois, had caused to be incorporated under the laws of that State the Calumet and Blue Island Railroad Company, the Chicago and Southeastern Railway Company of Illinois, the Joliet and Blue Island Railway Company, and the Chicago and Kenosha Railway Company, for the purpose of operating its switches and side tracks at South Chicago, Chicago, and Joliet, respectively, and engaging in traffic by a continuous shipment from cities and

places without to cities and places within Illinois, in connection, respectively, with the Baltimore and Ohio Railroad Company, the Baltimore and Ohio Southwestern Railroad Company, the Illinois Central Railroad Company, the Lake Shore and Michigan Southern Railway Company, the Chicago, Rock Island and Pacific Railway Company, the Pittsburgh, Fort Wayne and Chicago Railway Company, the Pennsylvania Company, the Pennsylvania Railroad Company, the Belt Railway Company, the Chicago and Alton Railroad Company, the Chicago Railway Transfer Company, the Atchison, Topeka and Santa Fé Railway Company, the Elgin, Joliet and Eastern Railway Company, the Chicago and Northwestern Railway Company, and the Chicago, Milwaukee and St. Paul Railway Company; that it had also caused to be incorporated under the laws of Wisconsin, for the purpose of operating its switches and side tracks at or near Milwaukee, in that State, and engaging in traffic or traffic by a continuous shipment from places and cities without to cities and places within Wisconsin, in connection with the Chicago, Milwaukee and St. Paul Railway Company, and the Chicago and Northwestern Railway Company; and that said Illinois Steel Company owned and controlled the above-named companies, which it caused to be incorporated under the laws of Illinois, and operated them in connection with the other companies named, "as a device for the purpose of evading the provisions of the act to regulate commerce, and obtaining special, illegal, unjust, and unreasonable rates for the transportation of interstate traffic," and, by the connivance and consent of said other connecting railroad companies, in such a manner as to give to the Illinois Steel Company an illegal, undue, and unreasonable preference and advantage, subjecting other persons, firms, and companies to undue and unreasonable prejudice and discrimination in the transportation of property from divers cities and places without the States of Illinois and Wisconsin to divers cities and towns within those States.

It was made to appear to the Commission that the companies so owned, controlled, and operated by the Illinois Steel Company for more than the six months then last past had

been and were still engaged in the transportation of property by railroad in connection with the other companies named "under a common control, management, and arrangement for a continuous carriage or shipment" from divers cities and towns without to divers cities and towns within the States of Illinois and Wisconsin, and that none of the companies, so owned, controlled, and operated, had filed with the Commission copies of their contracts, agreements, and common arrangements with the other companies, nor their tariffs nor schedules of rates, fares, and charges as required by the act of Congress.

The Commission, of its own motion, decided to investigate the matters set forth in said informal complaint by inquiring into the business of all of said railroad companies and the management thereof with reference as well to the alleged making of illegal, unjust, and unreasonable rates, as to the alleged unjust and illegal discrimination in favor of the Illinois Steel Company, and the failure, as above stated, to file with the Commission the above contracts, agreements, and tariffs.

An order was thereupon made by the Commission, which recited the facts of the informal complaint made to it, and required each of the above-mentioned companies to make and file in its office in Washington, a full, complete, perfect, and specific verified answer, setting forth all the facts in regard to the matters complained of and responding to the following questions:

1. Does any contract, agreement, or arrangement in writing or otherwise exist between the companies above alleged to be under the control [of] and operated by the said Illinois Steel Company and any of the other companies with reference to interstate traffic? If so, state the contract, agreement, or arrangement.

2. Or [are] any tariffs of rates and charges for the transportation of interstate property in effect between said companies above alleged to be under the control of and operated by the Illinois Steel Company and said other railroad companies? If so, what are they and what are the divisions thereof between the several carriers?

3. Have the companies above alleged to be under the control of and operated by the Illinois Steel Company received interstate traffic from any of the other carriers above mentioned during the six months last past, or have they delivered any such traffic to such other carriers during that time, for any person, firm, or company other than the Illinois Steel Company? and if so, to what amount?

The order further required all of the companies named to appear before the Commission at a named time and place in Chicago, when that body would proceed to make inquiry into and investigate the management of the said business by the carriers so ordered to appear.

Each of the companies which, according to the allegations of the petition, the Illinois Steel Company had caused to be incorporated, filed its answer with the Commission, and averred that it had in all respects complied with the obligations imposed upon it by the laws of the State and of the United States; that it was not engaged in interstate commerce within six months preceding the filing of the complaint against them; and it answered "No" to each of the above specific questions. The Calumet and Blue Island Railway Company also denied that the operation of its railways was a device to evade the provision of the Interstate Commerce Act, or had resulted in obtaining for the Illinois Steel Company special, illegal, unjust, or unreasonable rates in interstate traffic or in securing to that company illegal, undue, or unreasonable preferences.

The Commission, notwithstanding these denials, conceived it to be their duty to proceed with the investigation by the examination of witnesses and the books and papers of the corporations involved, and especially to ascertain whether the Illinois Steel Company was the owner in fact of the railroads, which it was alleged to have caused to be incorporated, and whether such incorporations were for the purpose of giving to that company an undue and illegal preference in the transportation of its property and freight.

Among the witnesses subpœnaed to testify before the Commission was William G. Brimson, the president and manager

of the five roads so incorporated in Illinois. Being asked what constituted the principal traffic of the roads, he said: "The business of these roads, except as indicated in the answers, is that of switching — switching business. We do a switching and terminal business, in that we are open to any business, for anybody's property, or persons who may locate at such place where we can go to them; mainly our business is with the Illinois Steel Company. This is the great proportion of our business." In reply to the question whether his company engaged in transportation business other than as stated by him, he said that they did not, "except the Calumet and Blue Island, as stated in our reply. On that we do engage in other business to a certain extent." Having stated that his companies did not engage in the transportation business for everybody and anybody having occasion to employ them, and that their business was limited to the above companies with which they had traffic arrangements, he was asked whether the companies of which he was president and manager were owned by the Illinois Steel Company. The witness, under the advice of counsel, refused to answer this question.

J. S. Keefe, secretary and auditor of the five roads mentioned, was examined by the Commission as a witness. He admitted that he had in his possession a book showing the names of the stockholders of the Calumet and Blue Island Railway Company, but refused, upon the demand of the Commission, to produce it. He also refused to answer the question, "Do you know, as a matter of fact, whether the Illinois Steel Company owns the greater part of the stock of these several railroads?"

William R. Stirling, first vice-president of the Illinois Steel Company, was also examined as a witness, and after stating that that company had a contract with the five railroads in question to handle the railroad business at the five "plants" of the Steel Company, refused to answer the question, "Is that the only relation which your company sustains to these railroad companies?"

On the succeeding day the Commission issued a *subpœna*

*duces tecum*, directed to J. S. Keefe, secretary and auditor of the five railroads in question, commanding him to appear before that body, and bring with him the stock books of those companies. A like subpœna was issued to William R. Stirling, as first vice-president of the Steel Company, commanding him to appear before the Commission and produce the stock books of that company. Keefe and Stirling appeared in answer to the subpœnas, but refused to produce the books or either of them so ordered to be produced.

The Commission thereupon, on the 15th day of July, 1892, presented to and filed in the court below its petition embodying the above facts, and prayed that an order be made requiring and commanding Brimson, Keefe, and Stirling to appear before that body and answer the several questions propounded by them and which they had respectively refused to answer, and requiring Keefe and Stirling to appear and produce before the Commission the stock books above referred to as in their possession.

The answers of Brimson, Keefe, and Stirling in the present proceeding, besides insisting that the questions propounded to them, respectively, were immaterial and irrelevant, were based mainly upon the ground that so much of the Interstate Commerce Act as empowered the Commission to require the attendance and testimony of witnesses and the production of books, papers, and documents, and authorized the Circuit Court of the United States to order common carriers or persons to appear before the Commission and produce books and papers and give evidence, and to punish by process for contempt any failure to obey such order of the court, was repugnant to the Constitution of the United States.

Is the twelfth section of the act unconstitutional and void, so far as it authorizes or requires the Circuit Courts of the United States to use their process in aid of inquiries before the Commission? The court recognizes the importance of this question, and has bestowed upon it the most careful consideration.

As the Constitution extends the judicial power of the United States to all cases in law and equity arising under that instru-

ment or under the laws of the United States, as well to all controversies to which the United States shall be a party, (Art. 3, sec. 2,) and as the Circuit Courts of the United States are capable, under the statutes defining and regulating their jurisdiction, of exerting such power in cases or controversies of that character, within the limits prescribed by Congress, 25 Stat. 434, c. 866, the fundamental inquiry on this appeal is whether the present proceeding is a " case " or " controversy " within the meaning of the Constitution. The Circuit Court, as we have seen, regarded the petition of the Interstate Commerce Commission as nothing more than an application by an administrative body to a judicial tribunal for the exercise of its functions in aid of the execution of duties not of a judicial nature, and accordingly adjudged that this proceeding did not constitute a case or controversy to which the judicial power of the United States could be extended.

At the same time the learned court said : " Undoubtedly, Congress may confer upon a non-judicial body authority to obtain information necessary for legitimate governmental purposes, and make refusal to appear and testify before it touching matters pertinent to any authorized inquiry, an offence punishable by the courts, subject, however, to the privilege of witnesses to make no disclosures which might tend to criminate them or subject them to penalties or forfeitures. A prosecution or an action for violation of such a statute would clearly be an original suit or controversy between parties within the meaning of the Constitution, and not a mere application, like the present one, for the exercise of the judicial power in aid of a non-judicial body." *In re Interstate Commerce Commission*, 53 Fed. Rep. 476, 480.

In other words, if the Interstate Commerce Act made the refusal of a witness duly summoned to appear and testify before the Commission in respect to a matter rightfully committed by Congress to that body for examination, an offence against the United States, punishable by fine or imprisonment, or both, a criminal prosecution or an information for the violation of such a statute would be a case or controversy to which the judicial power of the United States extended;

while a direct civil proceeding, expressly authorized by an act
of Congress, in the name of the Commission, and under the
direction of the Attorney General of the United States,
against the witness so refusing to testify, to compel him to
give evidence before the Commission touching the same mat-
ter, would not be a case or controversy of which cognizance
could be taken by any court established by Congress to
receive the judicial power of the United States.

This interpretation of the Constitution would restrict the
employment of means to carry into effect powers granted to
Congress within much narrower limits than, in our judgment,
is warranted by that instrument.

The Constitution expressly confers upon Congress the power
to regulate commerce with foreign nations, among the several
States, and with the Indian tribes, and to make all laws
necessary and proper for carrying that power into execution.
Art. 1, § 8. While the completely internal commerce of a
State is reserved to the State itself, because never surrendered
to the general government, commerce, the regulation of which
is committed by the Constitution to Congress, comprehends
traffic, navigation, and every species of commercial intercourse
or trade between the United States, among the several States,
and with the Indian tribes. *Gibbons* v. *Ogden*, 9 Wheat. 1,
193, 194. "It may be doubted," this court has said, "whether
any of the evils proceeding from the feebleness of the Federal
government contributed more to that great revolution which
introduced the present system than the deep and general con-
viction that commerce ought to be regulated by Congress. It
is not, therefore, matter of surprise that the grant should be
as extensive as the mischief, and should comprehend all foreign
commerce, and all commerce among the States. To construe
the power so as to impair its efficiency would tend to defeat
an object, in the attainment of which the American public
took, and justly took, that strong interest which arose from a
full conviction of its necessity." *Brown* v. *Maryland*, 12
Wheat. 419, 446; *Phila. Steamship Co.* v. *Pennsylvania*, 122 U. S.
326, 346. "In the matter of interstate commerce," this court,
speaking by Mr. Justice Bradley, has declared, "the United

States are but one country, and are and must be subject to one system of regulations, and not to a multitude of systems." *Robbins* v. *Shelby Taxing District,* 120 U. S. 489, 494. The same principle was announced by the present Chief Justice in *Stoutenburgh* v. *Hennick,* 129 U. S. 141, 148.

What is the nature of the power thus expressly given to Congress, and to what extent, and under what restrictions, may it be constitutionally exerted?

This question was answered when Chief Justice Marshall said that it was the power "to prescribe the rule by which commerce is to be governed." "This power," the Chief Justice continued, "like all others vested in Congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations other than are prescribed in the Constitution. These are expressed in plain terms, and do not affect the questions which arise in this case, or which have been discussed at the bar. If, as has always been understood, the sovereignty of Congress, though limited to specified objects, is plenary as to those objects, the power over commerce with foreign nations and among the several States is vested in Congress as absolutely as it would be in a single government having in its constitution the same restrictions on the exercise of the power as are found in the Constitution of the United States. The wisdom and the discretion of Congress, their identity with the people, and the influence which their constituents possess at elections, are, in this, as in many other instances, as that, for example, of declaring war, the sole restraints on which they have relied to secure them from its abuse. They are the restraints on which the people must often rely solely in all representative governments." *Gibbons* v. *Ogden,* 9 Wheat. 1, 189, 196–7.

Congress thus having plenary power subject to the limitations imposed by the Constitution to prescribe the rule by which commerce among the several States is to be governed, the question necessarily arises, what are the principles that should control the judiciary when determining whether a particular act of Congress, avowedly adopted in execution of that power, is consistent with the fundamental limitations of the Constitution?

The general principle applicable to this subject was long ago announced by this court, and has been so often affirmed and applied that argument in support of it is unnecessary, even if it were possible to suggest any thought not heretofore expressed in the adjudged cases. In the great case of *McCulloch* v. *Maryland*, 4 Wheat. 316, 421, 423, it was said : " The sound construction of the Constitution must allow to the national legislature that discretion, with respect to the means by which the powers-it confers are to be carried into execution, which will enable that body to perform the high duties assigned to it, in the manner most beneficial to the people. Let the end be legitimate, let it be within the scope of the Constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consistent with the letter and spirit of the Constitution, are constitutional." Again : " Where the law is not prohibited, and is really calculated to effect any of the objects entrusted to the government, to undertake here to inquire into the degree of its necessity would be to pass the line which circumscribes the judicial department, and to tread on legislative ground. This court disclaims all pretensions to such a power."

Guided by these principles, we proceed to inquire whether the twelfth section of the Interstate Commerce Act, so far as it authorizes the present proceeding, assumes to invest the Circuit Courts of the United States with functions that are not judicial.

It was not disputed at the bar, nor indeed can it be successfully denied, that the prohibition of unjust charges, discriminations, or preferences, by carriers engaged in interstate commerce, in respect to property or persons transported from one State to another, is a proper regulation of interstate commerce, or that the object that Congress has in view by the act in question may be legitimately accomplished by it under the power to regulate commerce among the several States. In every substantial sense such prohibition is a rule by which interstate commerce must be governed, and is plainly adapted to the object intended to be accomplished. The same obser-

vation may be made in respect to those provisions empowering the Commission to inquire into the management of the business of carriers subject to the provisions of the act, and to investigate the whole subject of interstate commerce as conducted by such carriers, and, in that way, to obtain full and accurate information of all matters involved in the enforcement of the act of Congress. It was clearly competent for Congress, to that end, to invest the Commission with authority to require the attendance and testimony of witnesses, and the production of books, papers, tariffs, contracts, agreements, and documents relating to any matter legally committed to that body for investigation. We do not understand that any of these propositions are disputed in this case.

Interpreting the Interstate Commerce Act as applicable, and as intended to apply, only to matters involved in the regulation of commerce, and which Congress may rightfully subject to investigation by a commission established for the purpose of enforcing that act, we are unable to say that its provisions are not appropriate and plainly adapted to the protection of interstate commerce from burdens that are or may be, directly and indirectly, imposed upon it by means of unjust and unreasonable discriminations, charges, and preferences. Congress is not limited in its employment of means to those that are absolutely essential to the accomplishment of objects within the scope of the powers granted to it. It is a settled principle of constitutional law that "the government which has a right to do an act, and has imposed on it the duty of performing that act, must, according to the dictates of reason, be allowed to select the means; and those who contend that it may not select any appropriate means, that one particular mode of effecting the object is excepted, take upon themselves the burden of establishing that exception." 4 Wheat. 316, 409. The test of the power of Congress is not the judgment of the courts that particular means are not the best that could have been employed to effect the end contemplated by the legislative department. The judiciary can only inquire whether the means devised in the execution of a power granted are forbidden by the Constitution. It cannot go beyond that inquiry

without entrenching upon the domain of another department of the government. That it may not do with safety to our institutions. *Sinking Fund Cases*, 99 U. S. 700, 718.

An adjudication that Congress could not establish an administrative body with authority to investigate the subject of interstate commerce and with power to call witnesses before it, and to require the production of books, documents, and papers relating to that subject, would go far towards defeating the object for which the people of the United States placed commerce among the States under national control. All must recognize the fact that the full information necessary as a basis of intelligent legislation by Congress from time to time upon the subject of interstate commerce cannot be obtained, nor can the rules established for the regulation of such commerce be efficiently enforced, otherwise than through the instrumentality of an administrative body, representing the whole country, always watchful of the general interests, and charged with the duty not only of obtaining the required information, but of compelling by all lawful methods obedience to such rules.

It is to be observed that independently of any question concerning the nature of the matter under investigation by the Commission — however legitimate or however vital to the public interests the inquiry being conducted by that body — the judgment below rests upon the broad ground that no *direct* proceeding to compel the attendance of a witness before the Commission, or to require him to answer questions put to him, or to compel the production of books, documents, or papers in his possession relating to the subject under examination, can be deemed a case or controversy of which, under the Constitution, a court of the United States may take cognizance, even if such proceeding be in form judicial. And the theory upon which the judgment proceeded is applicable alike to corporations and individuals, although by the established doctrine of the courts a railroad corporation may, under legislative sanction and upon making compensation, appropriate private property for the purposes of its right of way, because

and only because its road is a public highway established primarily for the convenience of the people and to subserve public objects, and, therefore, subject to governmental control. *Cherokee Nation* v. *Kansas Railway Co.,* 135 U. S. 641, 657.

What is a case or controversy to which, under the Constitution, the judicial power of the United States extends? Referring to the clause of that instrument, which extends the judicial power of the United States to all cases in law and equity arising under the Constitution, the laws of the United States, and treaties made or that shall be made under their authority, this court, speaking by Chief Justice Marshall, has said: " This clause enables the judicial department to receive jurisdiction to the full extent of the Constitution, laws, and treaties of the United States when any question respecting them shall assume such a form that the judicial power is capable of acting on it. That power is capable of acting only when the subject is submitted to it by a party who asserts his rights in the form prescribed by law. It then becomes a case, and the Constitution declares that the judicial power shall extend to all cases arising under the Constitution, laws, and treaties of the United States." *Osborn* v. *Bank of the United States,* 9 Wheat. 738, 819. And in *Murray* v. *Hoboken Co.,* 18 How. 272, 284, Mr. Justice Curtis, after observing that Congress cannot withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty, nor, on the other hand, bring under judicial power a matter which, from its nature, is not a subject for judicial determination, said: " At the same time there are matters involving public rights which may be presented in such form that the judicial power is capable of acting on them, and which are susceptible of judicial determination, but which Congress may or may not bring within the cognizance of the courts of the United States, as it may deem proper." So, in *Smith* v. *Adams,* 130 U. S. 173, Mr. Justice Field, speaking for the court, said that the terms "cases" and " controversies" in the Constitution embraced " the claims or contentions of litigants brought before the courts for adjudication by regular proceedings estab-

lished for the protection or enforcement of rights, or the prevention, redress, or punishment of wrongs."

Testing the present proceeding by these principles, we are of opinion that it is one that can properly be brought under judicial cognizance.

We have before us an act of Congress authorizing the Interstate Commerce Commission to summon witnesses and to require the production of books, papers, tariffs, contracts, agreements, and documents relating to the matter under investigation. The constitutionality of this provision — assuming it to be applicable to a matter that may be legally entrusted to an administrative body for investigation — is, we repeat, not disputed and is beyond dispute. Upon every one, therefore, who owes allegiance to the United States, or who is within its jurisdiction, enjoying the protection that its government affords, rests an obligation to respect the national will as thus expressed in conformity with the Constitution. As every citizen is bound to obey the law and to yield obedience to the constituted authorities acting within the law, this power conferred upon the Commission imposes upon any one, summoned by that body to appear and to testify, the duty of appearing and testifying, and upon any one required to produce such books, papers, tariffs, contracts, agreements, and documents, the duty of producing them, if the testimony sought, and the books, papers, etc., called for, relate to the matter under investigation, if such matter is one which the Commission is legally entitled to investigate, and if the witness is not excused, on some personal ground, from doing what the Commission requires at his hands. These propositions seem to be so clear and indisputable that any attempt to sustain them by argument would be of no value in the discussion. Whether the Commission is entitled to the evidence it seeks, and whether the refusal of the witness to testify or to produce books, papers, etc., in his possession, is or is not in violation of his duty or in derogation of the rights of the United States, seeking to execute a power expressly granted to Congress, are the distinct issues between that body and the witness. They are issues between the United States and those

who dispute the validity of an act of Congress and seek to obstruct its enforcement. And these issues, made in the form prescribed by the act of Congress, are so presented that the judicial power is capable of acting on them.

The question so presented is substantially, if not precisely, that which would arise if the witness was proceeded against by indictment under an act of Congress declaring it to be an offence against the United States for any one to refuse to testify before the Commission after being duly summoned, or to produce books, papers, etc., in his possession upon notice to do so, or imposing penalties for such refusal to testify or to produce the required books, papers, and documents. A prosecution for such offence or a proceeding by information to recover such penalties would have as its real and ultimate object to compel obedience to the rightful orders of the Commission, while it was exerting the powers given to it by Congress. And such is the sole object of the present direct-proceeding. The United States asserts its right, under the Constitution and laws, to have these appellees answer the questions propounded to them by the Commission, and to produce specified books, papers, etc., in their possession or under their control. It insists that the evidence called for is material in the matter under investigation; that the subject of investigation is within legislative cognizance, and may be inquired of by any tribunal constituted by Congress for that purpose. The appellees deny that any such rights exist in the general government, or that they are under a legal duty, even if such evidence be important or vital in the enforcement of the Interstate Commerce Act, to do what is required of them by the Commission. Thus has arisen a dispute involving rights or claims asserted by the respective parties to it. And the power to determine it directly, and, as between the parties, finally, must reside somewhere. It cannot be that the general government, with all the power conferred upon it by the people of the United States, is helpless in such an emergency, and is unable to provide some method, judicial in form, and *direct in its operation*, for the prompt and conclusive determination of this dispute.

As the Circuit Court is competent under the law by which it was ordained and established to take jurisdiction of the parties, and as a case arises under the Constitution or laws of the United States when its decision depends upon either, why is not this proceeding judicial in form and instituted for the determination of distinct issues between the parties, as defined by formal pleadings, a case or controversy for judicial cognizance, within the meaning of the Constitution? It must be so regarded, unless, as is contended, Congress is without power to provide any method for enforcing the statute or compelling obedience to the lawful orders of the Commission, except through criminal prosecutions or by civil actions to recover penalties imposed for non-compliance with such orders. But no limitation of that kind upon the power of Congress to regulate commerce among the States is justified either by the letter or the spirit of the Constitution. Any such rule of constitutional interpretation, if applied to all the grants of power made to Congress, would defeat the principal objects for which the Constitution was ordained. As the issues are so presented that the judicial power is capable of acting on them finally as between the parties before the court, we cannot adjudge that the mode prescribed for enforcing the lawful orders of the Interstate Commission is not calculated to attain the object for which Congress was given power to regulate interstate commerce. It cannot be so declared unless the incompatibility between the Constitution and the act of Congress is clear and strong. *Fletcher* v. *Peck*, 6 Cranch, 87, 128. In accomplishing the objects of a power granted to it, Congress may employ any one or all the modes that are appropriate to the end in view, taking care only that no mode employed is inconsistent with the limitations of the Constitution.

We do not overlook these constitutional limitations which, for the protection of personal rights, must necessarily attend all investigations conducted under the authority of Congress. Neither branch of the legislative department, still less any merely administrative body, established by Congress, possesses, or can be invested with, a general power of making inquiry into the private affairs of the citizen. *Kilbourn* v. *Thompson*,

103 U. S. 168, 190.   We said in *Boyd* v. *United States,* 116
U. S. 616, 630, — and it cannot be too often repeated, — that
the principles that embody the essence of constitutional lib-
erty and security forbid all invasions on the part of the gov-
ernment and its employés of the sanctity of a man's home,
and the privacies of his life.   As said by Mr. Justice Field in
*In re Pacific Railway Commission,* 32 Fed. Rep. 241, 250,
" of all the rights of the citizen, few are of greater importance
or more essential to his peace and happiness than the right of
personal security, and that involves, not merely protection
of his person from assault, but exemption of his private affairs,
books, and papers from the inspection and scrutiny of others.
Without the enjoyment of this right, all others would lose
half their value."

It was said in argument that the twelfth section was in
derogation of those fundamental guarantees of personal rights
that are recognized by the Constitution as inhering in the
freedom of the citizen.   It is scarcely necessary to say that
the power given to Congress to regulate interstate commerce
does not carry with it any power to destroy or impair those
guarantees.   This court has already spoken fully upon that
general subject in *Counselman* v. *Hitchcock,* 142 U. S. 547.
We need not add anything to what has been there said.
Suffice it in the present case to say that as the Interstate
Commerce Commission, by petition in a Circuit Court of the
United States, seeks, upon grounds distinctly set forth, an
order to compel appellees to answer particular questions and
to produce certain books, papers, etc., in their possession, it
was open to each of them to contend before that court that
he was protected by the Constitution from making answer to
the questions propounded to him ; or that he was not legally
bound to produce the books, papers, etc., ordered to be pro-
duced ; or that neither the questions propounded nor the
books, papers, etc., called for relate to the particular matter
under investigation, nor to any matter which the Commission
is entitled under the Constitution or laws to investigate.   These
issues being determined in their favor by the court below, the
petition of the Commission could have been dismissed upon
its merits.

It may be proper to state in this connection that after the decision in *Counselman* v. *Hitchcock*, the Interstate Commerce Act was amended by an act approved February 11, 1893, which provides " that no person shall be excused from attending and testifying, or from producing books, papers, tariffs, contracts, agreements, and documents before the Interstate Commerce Commission, or in obedience to the subpœna of the Commission, whether such subpœna be signed or issued by one or more commissioners, or in any cause or proceeding, criminal or otherwise, based upon or growing out of any alleged violation of the act of Congress, entitled ' An act to regulate commerce,' approved February fourth, eighteen hundred and eighty-seven, or of any amendment thereof, on the ground or for the reason that the testimony or evidence, documentary or otherwise, required of him may tend to criminate him or subject him to a penalty or forfeiture.. But no person shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing concerning which he may testify, or produce evidence, documentary or otherwise, before said Commission, or in obedience to its subpœna, or the subpœna of either of them, or in any such case or proceeding : *Provided,* That no person so testifying shall be exempt from prosecution and punishment for perjury committed in so testifying. Any person who shall neglect or refuse to attend and testify, or to answer any lawful inquiry, or to produce books, papers, tariffs, contracts, agreements, and documents, if in his power to do so, in obedience to the subpœna or lawful requirement of the Commission, shall be guilty of an offence, and upon conviction thereof by a court of competent jurisdiction shall be punished by fine not less than one hundred dollars nor more than five thousand dollars, or by imprisonment for not more than one year, or by both such fine and imprisonment." 27 Stat. 443, c. 83. But that act was not in force when this case was determined below. Nor does it reach the question whether a proceeding like the present one can be maintained in a Circuit Court of the United States.

In the course of the argument at the bar our attention was

called to *Hayburn's Case,* 2 Dall. 409, and *United States* v. *Ferreira,* 13 How. 40, 46, as announcing principles not in harmony with the views we have expressed in this opinion.

*Hayburn's case* was an application for a mandamus to be directed to the Circuit Court of the United States for the District of Pennsylvania, commanding that court to proceed in a petition by Hayburn to be put on the pension list of the United States in conformity with an act of Congress, approved March 23, 1792, c. 11, 1 Stat. 243, which provided for the settlement of the claims of widows and orphans barred by limitations previously established, and to regulate claims to invalid pensions. This court took the case under advisement, but as Congress provided in another way for the relief of invalid pensioners, no decision was made. Nevertheless, by a note to *Hayburn's case,* we are informed of the views expressed at the circuit by different members of this court in relation to the act of 1792. They concurred in holding that it was not in the power of Congress to assign to the courts of the United States any duties except such as were properly judicial, and to be performed in a judicial manner; and that the duties assigned to the Circuit Courts were not of that description, and were not contemplated by the act of Congress as of that character; and, consequently, that the act could be considered as only appointing commissioners for the purposes mentioned in it by official instead of personal descriptions, which positions the judges of the court were at liberty to accept or decline.

In a note prepared by Chief Justice Taney, under the direction of this court, and found in 13 How. 51, 52, an account is given of *Todd's case,* which also involved the validity of the act of 1792, so far as it imposed upon the Circuit Courts duties relating to pensions. And it is there stated that Chief Justice Jay and Justice Cushing, upon further reflection, became satisfied that the power conferred by the act of 1792 on the Circuit Court as a court could not be construed as giving such power to the judges of the court as commissioners.

The same general principles were announced in *Ferreira's case,* which arose under the treaty of 1819 between Spain and

the United States, and under certain acts of Congress passed to carry a particular article of that treaty into execution. The case came before this court upon appeal from a decision or award made by the district judge, acting upon a special statute authorizing him to receive and adjudicate certain claims. A motion to dismiss the appeal for want of jurisdiction in this court raised the question whether the district judge exercised judicial power, strictly speaking, under the Constitution. The motion to dismiss was sustained. Chief Justice Taney, referring to the statutes under which the district judge proceeded, said: "It is manifest that this power to decide upon the validity of these claims is not conferred on them as a judicial function to be exercised in the ordinary forms of a court of justice. For there is to be no suit; no parties in the legal acceptance of the term are to be made; no process to issue; and no one is authorized to appear in behalf of the United States, or to summon witnesses in the case. The proceeding is altogether *ex parte*, and all that the judge is required to do is to receive the claim when the party presents it, and to adjust it upon such evidence as he may have before him, or be able himself to obtain. But neither the evidence nor his award are to be filed in the court in which he presides, nor recorded there; but he is required to transmit both the decision and the evidence upon which he decided to the Secretary of the Treasury; and the claim is to be paid if the Secretary thinks it just and equitable, but not otherwise. It is to be a debt from the United States upon the decision of the Secretary, but not upon that of the judge. It is too evident for argument on the subject that such a tribunal is not a judicial one, and that the act of Congress did not intend to make it one. The authority conferred on the respective judges was nothing more than that of a commissioner to adjust certain claims against the United States; and the office of judges and their respective jurisdictions are referred to in the law merely as a designation of the persons to whom the authority is confided, and the territorial limits to which it extends. The decision is not the judgment of a court of justice. It is the award of a commission." 13 How. 40, 46, 47.

It thus appears that the act of 1792, above referred to, attempted to impose upon the courts of the United States duties purely administrative in their character.   So, also, the acts of Congress involved in *Ferreira's case* conferred no authority upon the district judge to determine finally any questions of a judicial nature, and, without requiring any petition to be filed, and without empowering the district attorney to enter an appearance for the United States, so as to make it a party to the proceeding, or to authorize a judgment against it, gave that officer the power only of adjusting, without the presence of parties, certain claims, the allowance and payment of which, after being so adjusted, were made to depend wholly upon the discretion of the Secretary of the Treasury.

Some allusion should be made in this connection to *Gordon* v. *United States*, 117 U. S. 697, and *In re Sanborn*, 148 U. S. 222.

In *Gordon's case*, the question was whether this court had jurisdiction to review the action of the Court of Claims in respect to a claim examined and allowed in the latter court under an act of Congress, 12 Stat. 765, c. 92, §§ 5, 7, 14, which, among other things, provided that no money should be paid out of the Treasury for any claim passed upon by the Court of Claims, until after an appropriation therefor should be estimated by the Secretary of the Treasury, and an appropriation to pay it be made by Congress.   Under that act neither the Court of Claims nor this court could do anything more than certify their opinion to the Secretary of the Treasury, and it depended upon that officer, in the first place, to decide whether he would include it in his estimates of private claims, and if he decided in favor of the claimant, it rested with Congress to determine whether it would or would not make an appropriation for its payment.   Neither the Court of Claims nor this court could, by any process, enforce its judgment ; and whether the claim was paid or not, did not depend on the decision of either court, but upon the future action of the Secretary of the Treasury and of Congress.

The appeal of Gordon was dismissed upon the ground that Congress could not " authorize or require this court to express

an opinion on a case where its judicial power could not be exercised, and where its judgment would not be final and conclusive upon the rights of the parties, and process of execution awarded to carry it into effect." "The award of execution," said Chief Justice Taney, ": is a part, and an essential part, of every judgment, passed by a court exercising judicial power. It is no judgment, in the legal sense of the term, without it. Without such an award the judgment would be inoperative and nugatory, leaving the aggrieved party without a remedy. It would be merely an opinion which would remain a dead letter, and without any operation upon the rights of the parties, unless Congress should at some future time sanction it, and pass a law authorizing the court to carry its opinion into effect. Such is not the judicial power confided to this court in the exercise of its appellate jurisdiction; yet it is the whole power that the court is allowed to exercise under this act of Congress." p. 702. See *De Groot* v. *United States*, 5 Wall. 419.

In *Sanborn's case*, above cited, the same principles were announced. That case arose under an act of Congress of March 3, 1887, 24 Stat. 505, c. 505, one section of which provided that " when any claim or matter may be pending in any of the executive departments which involves controverted questions of fact or law, the head of such department, with the consent of the claimant, may transmit the same, with the vouchers, papers, proofs, and documents pertaining thereto, to said Court of Claims, and the same shall be there proceeded in under such rules as the court may adopt. When the facts and conclusions of law shall have been found, the court shall report its findings to the department by which it was transmitted." § 12. This court dismissed an appeal from a finding of the Court of Claims, under this act. Referring to the cases of *Hayburn*, *Todd*, *Ferreira*, and *Gordon*, above cited, it observed : " Such a finding is not made obligatory on the department to which it is reported — certainly not so in terms — and not so, as we think, by any necessary implication. We regard the function of the Court of Claims, in such a case, as ancillary and advisory only. The finding or conclusion

reached by that court is not enforceable by any process of execution issuing from the court, nor is it made by the statute the final and indisputable basis of action either by the department or by Congress." p. 226.

The views we have expressed in the present case are not inconsistent with anything said or decided in those cases. They do not, in any manner, infringe upon the salutary doctrine that Congress (excluding the special cases provided for in the Constitution, as, for instance, in section two of article two of that instrument) may not impose upon the courts of the United States any duties not strictly judicial. The duties assigned to the Circuit Courts of the United States by the twelfth section of the Interstate Commerce Act are judicial in their nature. The inquiry whether a witness before the Commission is bound to answer a particular question propounded to him, or to produce books, papers, etc., in his possession and called for by that body, is one that cannot be committed to a subordinate administrative or executive tribunal for final determination. Such a body could not, under our system of government, and consistently with due process of law, be invested with authority to compel obedience to its orders by a judgment of fine or imprisonment. Except in the particular instances enumerated in the Constitution, and considered in *Anderson* v. *Dunn*, 6 Wheat. 204, and in *Kilbourn* v. *Thompson*, 103 U. S. 168, 190, of the exercise by either house of Congress of its right to punish disorderly behavior upon the part of its members, and to compel the attendance of witnesses, and the production of papers in election and impeachment cases, and in cases that may involve the existence of those bodies, the power to impose fine or imprisonment in order to compel the performance of a legal duty imposed by the United States, can only be exerted, under the law of the land, by a competent judicial tribunal having jurisdiction in the premises. See *Whitcomb's Case*, 120 Mass. 118, and authorities there cited.

Without the aid of judicial process of some kind, the regulations that Congress may establish in respect to interstate commerce cannot be adequately or efficiently enforced. One

mode, as already suggested, — the validity of which is not questioned, — of compelling a witness to testify before the Interstate Commerce Commission, to answer questions propounded to him relating to the matter under investigation and which the law makes it his duty to answer, and to produce books, papers, etc., is to make his refusal to appear and answer, or to produce the documentary evidence called for, an offence against the United States punishable by fine or imprisonment. A criminal prosecution of the witness under such a statute, it is conceded, would be a case or controversy within the meaning of the Constitution, of which a court of the United States could take jurisdiction. Another mode would be to proceed by information to recover any penalty imposed by the statute. A proceeding of that character, it is also conceded, would be a case or controversy of which a court of the United States could take cognizance. If, however, Congress, in its wisdom, authorizes the Commission to bring before a court of the United States for determination the issues between it and a witness, that mode of enforcing the act of Congress, and of compelling the witness to perform his duty, is said not to be judicial, and is beyond the power of Congress to prescribe.

We cannot assent to any view of the Constitution that concedes the power of Congress to accomplish a named result, indirectly, by particular forms of judicial procedure, but denies its power to accomplish the same result, directly, and by a different proceeding judicial in form. We could not do so without denying to Congress the broad discretion with which it is invested by the Constitution of employing all or any of the means that are appropriate or plainly adapted to an end which it has unquestioned power to accomplish, namely, the protection of interstate commerce against improper burdens and discriminations. Indeed, of all the modes that could be constitutionally prescribed for the enforcement of the regulations embodied in the Interstate Commerce Act, that provided by the 12th section is the one which, more than any other, will protect the public against the devices of those who, taking advantage of special circumstances, or by means of combinations too powerful to be resisted and overcome by individual

effort, would subject commerce among the States to unjust and unreasonable burdens.

The present proceeding is not merely ancillary and advisory. It is not, as in *Gordon's case,* one in which the United States seeks from the Circuit Court of the United States an opinion that " would remain a dead letter, and without any operation upon the rights of the parties." The proceeding is one for determining rights arising out of specified matters in dispute that concern both the general public and the individual defendants. It is one in which a judgment may be rendered that will be conclusive upon the parties until reversed by this court. And that judgment may be enforced by the process of the Circuit Court. Is it not clear that there are here parties on each side of a dispute involving grave questions of legal rights, that their respective positions are defined by pleadings, and that the customary forms of judicial procedure have been pursued? The performance of the duty which, according to the contention of the government, rests upon the defendants, cannot be directly enforced except by judicial process. One of the functions of a court is to compel a party to perform a duty which the law requires at his hands. If it be adjudged that the defendants are, in law, obliged to do what they have refused to do, that determination will not be merely ancillary and advisory, but, in the words of *Sanborn's case,* will be a " final and indisputable basis of action," as between the Commission and the defendants, and will furnish a precedent in all similar cases. It will be as much a judgment that may be carried into effect by judicial process as one for money, or for the recovery of property, or a judgment in mandamus commanding the performance of an act or duty which the law requires to be performed, or a judgment prohibiting the doing of something which the law will not sanction. It is none the less the judgment of a judicial tribunal dealing with questions judicial in their nature, and presented in the customary forms of judicial proceedings, because its effect may be to aid an administrative or executive body in the performance of duties legally imposed upon it by Congress in execution of a power granted by the Constitution.

This view is illustrated by the case of *Fong Yue Ting* v. *United States*, 149 U. S. 698, 728, which arose under the act of May 5, 1892, c. 60, prohibiting the coming of Chinese persons into the United States. That act provided for the arrest and removal from the United States of any person of Chinese descent unlawfully within this country, unless such person shall establish, by affirmative proof, to the satisfaction of a justice, judge, or commissioner of the United States before whom he might be brought and tried, his lawful right to remain in the United States. It also authorized the arrest of such person by any customs official, collector of internal revenue, or United States marshal, and taken before a United States judge. This court said: "When, in the form prescribed by law, the executive officer, acting in behalf of the United States, brings the Chinese laborer before the judge, in order that he may be heard, and the facts upon which depends his right to remain in the country be decided, a case is duly submitted to the judicial power; for here are all the elements of a civil case — a complainant, defendant, and a judge — *actor, reus et judex.* 3 Bl. Com. 25; *Osborn* v. *Bank of the United States*, 9 Wheat. 738, 819. No formal complaint or pleadings are required, and the want of them does not affect the authority of the judge or the validity of the statute."

Another suggestion thrown out in argument against the validity of the twelfth section of the Interstate Commerce Act, in the particular adverted to, is that the defendants are not accorded a right of trial by jury. If, as we have endeavored to show, this proceeding makes a case or controversy within the judicial power of the United States, the issue whether the defendants are under a duty to answer the questions propounded to them, and to produce the books, papers, documents, etc., called for, is manifestly not one for the determination of a jury. The issue presented is not one of fact, but of law exclusively. In such a case, the defendant is no more entitled to a jury than is a defendant in a proceeding by mandamus to compel him, as an officer, to perform a ministerial duty. Of course, the question of punishing the defendants for contempt could not arise before the Commis-

sion ; for, in a judicial sense, there is no such thing as contempt of a subordinate administrative body. No question of contempt could arise until the issue of law, in the Circuit Court, is determined adversely to the defendants and they refuse to obey, not the order of the commission, but the final order of the court. And, in matters of contempt, a jury is not required by " due process of law." From the very nature of their institution, and that their lawful judgments may be respected and enforced, the courts of the United States possess the power to punish for contempt. And this inherent power is recognized and enforced by a statute expressly authorizing such courts to punish contempts of their authority when manifested by disobedience of their lawful writs, process, orders, rules, decrees, or commands. Rev. Stat. § 725 ; 1 Stat. 83 ; 4 Stat. 487 ; *United States* v. *Hudson,* 7 Cranch, 32 ; *Anderson* v. *Dunn,* 6 Wheat. 204, 227 ; *Ex parte Robinson,* 19 Wall. 505, 510 ; *Ex parte Terry,* 128 U. S. 289, 302, 303 ; *Cartwright's Case,* 114 Mass. 230, 238. Surely it cannot be supposed that the question of contempt of the authority of a court of the United States, committed by a disobedience of its orders, is triable, of right, by a jury.

We are of opinion that a judgment of the Circuit Court of the United States determining the issues presented by the petition of the Interstate Commerce Commission, and by the answers of the appellees, will be a legitimate exertion of judicial authority in a case or controversy to which, by the Constitution, the judicial power of the United States extends. A final order by that court dismissing the petition of the Commission, or requiring the appellees to answer the questions propounded to them, and to produce the books, papers, etc., called for, will be a determination of questions upon which a court of the United States is capable of acting and which may be enforced by judicial process. If there is any legal reason why appellees should not be required to answer the questions put to them, or to produce the books, papers, etc., demanded of them, their rights can be recognized and enforced by the court below when it enters upon the consideration of the merits of the questions presented by the petition.

In view of the conclusion reached upon the only question determined by the Circuit Court, what judgment shall be here entered? The case was heard below upon the petition of the Commission and the answers of the defendants. But no ruling was made in respect to the materiality of the evidence sought to be obtained from the defendants. Passing by every other question in the case, the Circuit Court, by its judgment, struck down so much of the twelfth section as authorized or required the courts to use their process in aid of inquiries before the Commission. Under the circumstances, we do not feel obliged to go further at this time than to adjudge, as we now do, that that section in the particular named is constitutional, and to remand the cause that the court below may proceed with it upon the merits of the questions presented by the petition and the answers of the defendants and make such determination thereof as may be consistent with law. Any other course would, it might be apprehended, involve the exercise of original jurisdiction, and might possibly work injustice to one or the other of the parties.

*For the reasons stated the judgment is reversed, and the cause is remanded for further proceedings in conformity with this opinion.*

Mr. Chief Justice Fuller, Mr. Justice Brewer, and Mr. Justice Jackson dissented.[1]

Mr. Justice Field was not present at the argument of this case, and took no part in the consideration and decision of it.

---

[1] The dissenting opinion, by Mr. Justice Brewer, had not been filed when this volume went to press. It will appear in Vol. 155.