INTERSTATE COMMERCE COMMISSION v. HARRIMAN et al.

(Circuit Court, S. D. New York.   January 15, 1908.)

1. COMMERCE—INTERSTATE COMMERCE—POWERS OF INTERSTATE COMMERCE COMMISSION.

One purpose of the interstate commerce legislation is to compel interstate carriers to perform their commercial functions adequately, and, under the power specifically given the Interstate Commerce Commission, to ascertain the "cost and value of the carriers property," and, as affecting the ability of a carrier to perform such adequate service, the commission has authority to inquire into purchases of property made by it, the prices paid, and the lawfulness and propriety of its acquisition.

2. SAME—INVESTIGATION—SCOPE OF RESOLUTION.

A resolution of the Interstate Commerce Commission ordering an investigation and inquiry into consolidations and combinations of carriers subject to the interstate commerce act and the relations existing between them, "including community of interests therein and the practices and methods of such carriers affecting the movement of interstate commerce," to ascertain whether the same "result in violation of said act or tend to defeat its purposes," is broad enough to include an inquiry into a purchase by such a carrier of stock in other connecting or competing carriers from its own officers or directors, the price paid for the same, and what, if any, profit such officers or directors made thereon; but it does not authorize an inquiry as to whether the action of the directors of a railroad company in withholding public announcement of the declaration by them of an increased dividend was for the purpose of private speculation in the stock.

3. SAME—POWERS OF COMMISSION—INSTITUTING INVESTIGATION.

The Interstate Commerce Commission has plenary power to institute an investigation into any matter within its jurisdiction, as well as to proceed on complaints filed before it.

4. UNITED STATES—POWERS OF CONGRESS—INVESTIGATIONS.

The powers of Congress in respect to investigation and legislation are not absolutely identical; but the power of investigation is the wider and extends to matters on which it could not constitutionally legislate directly, if they are reasonably calculated to afford information useful and material in the framing of constitutional legislation.

5. SAME—REGULATION OF INTERSTATE COMMERCE—POWERS OF CONGRESS.

While Congress has no power under the interstate commerce clause of the Constitution to legislate directly with respect to a purchase by a state corporation engaged in interstate commerce of property from its directors, even though such purchase should be at a price so excessive as to be illegal or fraudulent as between the parties, yet having power to regulate the operations of such corporations as interstate carriers, as well with respect to their finances as other instrumentalities, it may lawfully require a disclosure as to such transactions.

6. WITNESSES—CONFIDENTIAL RELATIONS—PERSON ENTITLED TO ASSERT PRIVILEGE.

A banker is not privileged to withhold information as to the identity of a person depositing securities with his bank when such information is material in a lawful investigation, judicial or legislative.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 50, Witnesses, § 744.]

On Application for Order Requiring Respondents to Answer Certain Questions Propounded by Petitioner.

Frank B. Kellogg, Cordenio A. Severance, Henry L. Stimson, U. S. Atty., and Felix Frankfurter, Asst. U. S. Atty., for Interstate Commerce Commission.

Robert S. Lovett, John G. Milburn, and John C. Spooner, for respondent Harriman.

Paul D. Cravath and Walker D. Hines, for respondent Kahn.

HOUGH, District Judge. On November 15, 1906, an order was passed by the petitioner as follows:

"Whereas, it appears to the commission that consolidations and combinations of carriers subject to the act, and the relations now and heretofore existing between such carriers, including community of interests therein, and the practices and methods of such carriers affecting the movement of interstate commerce, the rates received and facilities furnished therefor, should be made the subject of investigation by the commission, to the end that it may be fully informed in respect thereof, and to the further end that it may be ascertained whether such consolidations, combinations, relations, community of interests, practices, or methods result in violation of said act or tend to defeat its purposes, it is ordered that a proceeding of investigation and inquiry into and concerning the matters above stated be, and the same hereby is, instituted," etc.

The "act" referred to in the order quoted is the "act to regulate commerce" of 1887, as amended by sundry statutes to and including that commonly known as the "Hepburn Bill" of June 29, 1906. 34 Stat. 584, c. 3591 [U. S. Comp. St. Supp. 1907, p. 892]. Pursuant to the order quoted, testimony was taken in many parts of the country, and at certain sessions held within this district Messrs. Harriman and Kahn were summoned as witnesses. The testimony shows that from 1897 or thereabouts to and including the period of investigation Mr. Harriman was an officer of importance in the Union Pacific Railroad Company, a corporation of the state of Utah. During a portion of the time mentioned he was the president of the company, and during all the time a director and member of the executive committee; the powers of that committee being "to manage and direct all the business and affairs of the company in such manner as such committee shall deem best for the company's interest in all cases in which specific directions shall not have been given by the board" of directors. Mr. Kahn is a member of the firm of Kuhn, Loeb & Co., which firm has had many financial dealings with the Union Pacific Company, and until 1906 he was himself a director and member of the executive committee. In 1901 the Union Pacific issued its convertible bonds in the sum of $100,-000,000 par, and caused one of its controlled companies, the Oregon Short Line, to issue bonds amounting to $45,000,000 par. With the proceeds of the sale of these bonds, and afterwards with the profits resulting from the sale of securities allotted to it in the distribution of assets of the Northern Securities Company, the Union Pacific purchased large quantities of the stock of other railway corporations; and it also acquired a great, if not controlling, interest in the capital stock of the Southern Pacific Company, a "holding" corporation of Kentucky. By purchase the Union Pacific obtained many millions par value of the stocks of the Chicago & Alton, Atchison, Topeka & Santa

157 F.—28

Fé, Illinois Central, St. Joseph & Grand Island, and New York Central & Hudson River Railroads. The Chicago & Alton stock was purchased at a price fixed by a committee of three, of whom Mr. Harriman was one, and Messrs. Kuhn, Loeb & Co. acted as stock depositary for the purpose of facilitating the sale. These facts having appeared, Mr. Harriman was asked, "Did you own any (stock) that was so deposited?" and this question he declined to answer. Mr. Kahn was asked whether the directors or any of them of the Union Pacific were owners of any part of the Chicago & Alton stock so sold through his firm, and the series of questions embodying this inquiry he declined to answer. The Illinois Central stock was acquired by the Union Pacific in part directly from Mr. Harriman and two other directors of the Union Pacific Company, and the rest from Messrs. Kuhn, Loeb & Co. acting for individual clients. These facts having appeared, Mr. Harriman was asked whether he had acquired any portion of the Illinois Central stock sold by him, with a view of selling it to the Union Pacific, also whether he had procured it at a lower price than that paid him by the Union Pacific, and, further, whether he had any interest in that portion of the stock sold the Union Pacific by. Messrs. Kuhn, Loeb & Co.; and these questions he declined to answer. Mr. Kahn was asked with respect to the Illinois Central transaction how much, if any, of the stock of that company was held and sold by his firm in the interest or for the benefit of any or all directors of the Union Pacific Company, and this question in divers forms he declined to answer. As to the Atchison, Topeka & Santa Fé stock, some evidence was adduced tending to show that Mr. Harriman and certain other directors of the Union Pacific had personally acquired large quantities thereof. Inquiry was then addressed to Mr. Harriman as to whether the Atchison stock purchased by the Union Pacific was a part of the block held by himself and his fellow directors; and this question he declined to answer. The St. Joseph & Grand Island stock purchased by the Union Pacific was admittedly bought from Mr. Harriman, who was then president of the St. Joseph road. When asked when and at what price he had obtained the stock so sold by him to the Union Pacific, he declined to answer. It having appeared with respect to the New York Central & Hudson River stock that a large quantity had been purchased by the Union Pacific at prices testified to, Mr. Harriman was asked whether any of the directors of the Union Pacific Railroad were interested directly or indirectly in this stock at the time it was bought, and he declined to answer. And, lastly, it appeared that in August, 1906, the Union Pacific largely increased its dividend rate, and that announcement of the fact of increase was delayed for two days by the executive committee of which Mr. Harriman was then chairman. On being asked whether he or any other director had bought Union Pacific stock in anticipation of this increased dividend, he declined to answer.

The questions under consideration may be divided as follows: (1) The numerous interrogatories relating to stock bought by the Union Pacific. The evident object of all these questions is to confirm or dissipate the suspicion that Mr. Harriman and other directors of the Union Pacific expended the funds of their company in purchasing

stocks at prices higher than should have been paid, or in buying stocks that should not have been purchased, being moved thereto by the private profits arising from the transactions. (2) The question relating to purchases of Union Pacific stock, the obvious purpose of which is to ascertain whether Mr. Harriman or his fellow directors used their knowledge of an intended dividend increase to speculate in the stock of their own company, the market price of which sharply appreciated when the increase became publicly known.

The grounds assigned by the witnesses for the several refusals to answer may be summarized as follows: (1) The questions propounded are not pertinent, relevant, or material to any inquiry stated or defined by the resolution of the Interstate Commerce Commission first above quoted. (2) Said resolution or order was an improper method of originating inquiry by the commission, as the only procedure properly bringing the powers of the commission into operation is a complaint by some person, firm, or corporation duly presented to the commission, and heard after notice to the party concerning whom the complaint is made. (3) If, however, it be not necessary to base an investigation upon a complaint, and if the resolution or order be broad enough in its language to cover the questions propounded, then the commission is not empowered either to pass the resolution, or make the order or ask the questions by any statutory grant of power, the only existing grant being the interstate commerce act, and no language of that act justifies the resolution. (4) If, however, Congress has assumed to grant statutory power authorizing such procedure as well as the questions under consideration, then such congressional grant is unconstitutional, inasmuch as Congress itself could not press these questions, because they do not relate to commerce among the several states, nor to any transactions in such commerce, and, a fortiori, Congress cannot delegate to the commission a power not possessed by itself. In these objections both respondents join, but Mr. Kahn further urges: (5) That, having testified truthfully to all transactions either of his own or of his firm, he is protected from divulging the identity or private affairs of his firm's "clients"; i. e., those customers who deposited with Kuhn, Loeb & Co. certain stock to be sold.

1. Whether the language of the petitioner's resolution is broad enough to justify the questions depends upon the view taken of the purposes of the interstate commerce law. It is clearly stated that what (inter alia) the commission wishes to ascertain is whether the "relations" existing between carriers subject to the act and "community of interests," if any, existing among them, "tend to defeat" the purposes of the act. That the ownership by one such company of very large blocks of the capital stock of other companies creates a relation between the corporations involved, and also a community of interest in quite a peculiar sense, is not open to doubt; and, if such relation is produced, and community of interest created, by expenditure of assets at inflated prices, or primarily for the benefit of those directors who both buy and sell the stocks purchased, such unwise, immoral, and perhaps unlawful investment of trust funds does most effectually tend to defeat the purposes of the act, unless such purposes be quite different from those generally supposed to have been asserted by Congress in enacting the

statute. The purpose of this legislation is to compel interstate carriers to perform their commercial functions adequately, and that word includes the idea of economy, while among the powers specifically given the commission is that of ascertaining the "cost and value of the carrier's property." It is not possible to fulfill the duties thus conferred without investigating, not only the existence of certain items of property, their lawfulness in the owners' hands, and the price at which they are carried on the books, but also the motives actuating the purchase as affecting either the truth of the price alleged, or its propriety. Mr. Harriman, by counsel, asserted before the commission that the Union Pacific Company could mortgage its interstate railway for anything it pleased, and invest the proceeds of the hypothecation in anything permitted by the laws of Utah at prices and from vendors not open to investigation or criticism by the commission. From this premise it must follow that any interstate carrying company created by state law may ruin itself through improvident investments, and thereby become wholly unable to fulfill its carrying functions, and yet do nothing which (in the language of the resolution) will tend to defeat the purposes of the act. I believe this to be a fair statement of respondents' position, and such statement is its own refutation. All the questions relating to the purchase of stock are therefore in my opinion within the purview of the resolution. The question relating to possible speculation in Union Pacific shares seems to me to stand in quite a different light. The dividend had been declared, its amount or rate is not in question, presumably it had been earned, but, whether advisedly declared or not, the deed had been done and the corporate act completed. Whatever the moral aspect of the alleged or suggested action of the executive committee or of all the directors, I do not see how the withholding of information from the public after dividend declared tended to defeat the purposes of the act or impair the ability of the Union Pacific to perform its duties as an interstate carrier.

2, 3. The contentions that an inquiry instigated or originated by the commission itself is not within the statutory grant of power, and that a complainant is necessary to set in motion whatever powers the commission possesses, are clearly opposed to the practice of many years, and to the necessary result of some decisions by the highest tribunal. The Matter of Enterprise Steamship Co., 11 Interst. Com. R. 587, is an important case of an investigation begun by an "informal complaint" into a matter over which the commission had no power. Such investigation was purely for information as a groundwork for recommendation. It also appears that the Northern Securities Case grew out of a resolution of inquiry worded almost exactly like the one first above quoted, while it is expressly recited in Interstate Commerce Commission v. Brimson, 154 U. S. 465, 14 Sup. Ct. 1128 (38 L. Ed. 1047), that Mr. Brimson was summoned to testify in a matter which "the commission of its own motion decided to investigate." The same judgment expressly recognizes (page 472 of 154 U. S., page 1131 of 14 Sup. Ct. [38 L. Ed. 1047]) that Congress has by the act in question given the commission power to "investigate the whole subject of interstate commerce, and in that way to obtain full and accurate information of all matters involved in the enforcement of" the act;

and the commission is also "endowed with plenary administrative power to supervise the conduct of carriers, to investigate their affairs, their accounts and their methods of dealing." Texas & Pacific Ry. v. Abilene Cotton Oil Co., 204 U. S. 438, 27 Sup. Ct. 354, 51 L. Ed. 553. There is therefore a congressional grant of power as ample as the subject in all its ramifications demands, and especially extending to the accumulation of information on matters, knowledge of which is material to the full enforcement of the statute; and such grant of power covers original investigation, as well as inquiry into the truth or falsity of definite statements of fact made by parties in quasi judicial proceedings begun by complaint or petition.

4. This objection suggests several inquiries, all argued with great ability, of surpassing interest, and deserving the prompt attention of the highest court: (a) Could Congress itself legislate upon the subjects reasonably suggested by the questions under consideration? (b) If Congress could not so legislate, are the matters so reasonably suggested within the congressional power of investigation, assuming that the powers of legislation and investigation are not coterminous, and that the power of investigation is the larger? (c) Would congressional action, either in forcing answers to the questions in hand or legislating on any matter suggested by them, trench upon the powers of the states, by assuming to regulate, govern, or visit a state corporation in matters not relating to commerce as that word is used in the federal Constitution?

4a. This query as put and answered by respondents assumes that should the answers show certain directors of the Union Pacific to have sold property of their own to that corporation at prices aliunde proven to be inflated, or giving abnormal or even unlawful profits to the vendors, or to have so sold property of a kind unwise or illegal for their corporation to possess, yet Congress could not punish the act of either director or corporation by the application of any existing statute or the passing of any constitutional law. From this premise it is argued that what federal power cannot cure or punish, that it cannot inquire into. I think it is true that if any director or directors of a state corporation engaged even wholly in interstate or foreign commerce are guilty of malfeasance in office, in effect make away with corporate funds, or are privy to the waste or devastavit thereof, Congress can afford no direct remedy for that particular kind of wrongdoing under the authority of the commerce clause of the Constitution. This is but a statement of conditions adverted to in both the prevailing and dissenting opinions in the recent Employers' Liability Cases. Howard v. Illinois Central R. R. Co. (S. C. U. S., Jan. 6, 1908) 28 Sup. Ct. 141, 52 L. Ed. ——. Justice White remarked that it was contended:

"That because one engages in interstate commerce he thereby submits all his business concerns to the regulating power of Congress. To state the proposition is to refute it."

And Justice Moody observed that:

"Of course, the power to regulate commerce does not authorize Congress to control the general conduct of persons engaged therein."

But respondents' statement of the problem, while laying down a correct legal rule, does not give all the problem conditions. The matters under investigation by the commission and to which these questions relate are the relations, practices, and methods of interstate carriers tending to defeat the purposes of valid federal legislation. No person or company can engage in any commercial occupation without capital, and the management and investment thereof is as much a commercial instrumentality as is a locomotive or an engineer; and that the power of Congress extends over all instrumentalities of commerce is no longer doubtful. Hopkins v. U. S., 171 U. S. 597, 19 Sup. Ct. 40, 43 L. Ed. 290; Northern Securities Co. v. U. S., 193 U. S. 344, 24 Sup. Ct. 436, 48 L. Ed. 679. The method of exercising such power is always open to discussion under the infinitely varied circumstances of commercial activity; but to me it seems clear that financial regulation of corporations engaged in interstate commerce is a regulation of that commerce by regulating its most potent instrumentality. Again, as was observed in Crutcher v. Kentucky, 141 U. S. 57, 11 Sup. Ct. 853, 35 L. Ed. 649:

"To carry on interstate commerce is not a franchise or privilege granted by the state. It is a right which every citizen of the United States is entitled to exercise under the Constitution and laws of the United States, and the accession of mere corporate facilities"

—neither deprives the corporate aggregation of that right nor confers upon it any especial privilege not already possessed in respect of interstate operations. But, if a corporation duly chartered does engage in interstate commerce, "Congress would undoubtedly have the right to exact from associations of that kind any guarantees it might think necessary for the public security and for the faithful transaction of business." 141 U. S. 57, 11 Sup. Ct. 853 (35 L. Ed. 649). If, therefore, Congress does possess the powers above indicated, it is within those powers to legislate, not directly against particular officers, nor by way of conferring causes of action on stockholders or the corporation itself, nor by creating new crimes, but by limiting the interstate operation of corporations not complying with federal safeguards against the recurrence of obnoxious practices, and licensing those affording the public security against methods calculated to diminish solvency, and therefore efficiency and economy in interstate transportation. This is the larger subject reasonably suggested by the questions propounded, and on that subject I think the power of Congress is ample, though as yet not fruitful in results.

4b. In considering this branch of the discussion, it is assumed, as heretofore indicated, that sections 12 and 20 of the "act to regulate commerce," by authorizing the commission to "inquire into the management of the business" of companies subject to the act, and then specifying "cost and value of the carrier's property" as one of the items carriers are bound to state, have granted full power to investigate the matters suggested by the questions under consideration. Quite plainly subjects interesting and important in the regulation of interstate or foreign transportation facilities might be inquired into within the language of the sections referred to, yet such matters might be

wholly beyond the power of congressional regulation. A familiar instance is the cab service of the large railways having terminals in this city, a subject which received consideration in Pennsylvania R. R. Co. v. Knight, 192 U. S. 21, 24 Sup. Ct. 202, 48 L. Ed. 325. These cabs are engaged in no interstate transaction, yet they may and do play a not unimportant part in the acquisition and enjoyment of interstate passenger traffic; and under easily conceivable circumstances might become the subject (in connection with larger matters) of investigation by the commission, and information regarding their number, use, and cost would be necessary to a full comprehension of the conditions under which wholly interstate operations were taking place. If such an investigation were to occur, I do not doubt that neither the cab drivers nor the directors of the corporation owning the vehicles could shelter themselves behind the proposition that their cabs were not engaged in interstate traffic; and this because, although not actually engaged therein, they are an adjunct thereto, as might also be a terminal hotel or other local convenience or attraction for the traveling public belonging to the carrying corporation. It is certainly no longer open to discussion that within its constitutional limitations Congress has all the powers of a national parliament or legislature. There is no presumption in favor of any congressional assumption of power; but once the subject of legislation is established as within the constitutional grant, then in respect of that subject the power is as unlimited as any possessed by any legislative assembly. In the light of Kilbourn v. Thompson, 103 U. S. 168, 26 L. Ed. 377, In re Chapman, 166 U. S. 661, 17 Sup. Ct. 677, 41 L. Ed. 1154, was decided, and in my judgment that case is ample authority for the proposition that once the subject under investigation be found to be within the powers of Congress then even collateral and incidental inquiries, however unpleasant to particular individuals, may be pressed home; Congress itself being in the first instance the judge of what questions are pertinent to the subject-matter in hand. As already indicated, I consider the questions under consideration extremely pertinent to the matter under investigation by the commission. People ex rel. McDonald v. Keeler, 99 N. Y. 464, 2 N. E. 615, 52 Am. Rep. 49, was also decided after Kilbourn v. Thompson, supra; and there Rapallo, J., observed that:

"The power of obtaining information for the purpose of framing laws to meet supposed or apprehended evils is one which has from time immemorial been deemed necessary, and has been exercised by legislative bodies."

It is not necessary in order to discover this power in Congress to indicate exact constitutional language creating it. It is necessary to point out in the Constitution that which authorizes Congress to legislate, but once that be shown and the subject of investigation be reasonably included within the subject of legislation, even though collateral or incidental thereto, I think the so-called inquisitorial power of Congress is in that regard entirely clear. It results that the powers of investigation and legislation are not absolutely identical, and that that of investigation is the wider, though even that must necessarily be confined to matters reasonably calculated to afford information useful and material in the framing of constitutional legislation.

4c. Whether the powers above found to inhere in Congress, and by that body lawfully intrusted to the commission, violate any of the reserved powers of the states, is a question really answered, when existence of the federal power is proved. It has been ably argued that matters of investment, questions of price and propriety, and points of official morals are as to state corporations, all within the visitatorial powers of the states creating the corporations concerned. That in all civil corporations that power resides in the sovereign (Black. bk. 1, cap. 18), and that it essentially consists in a "power to control and arrest abuse" (Allen v. McKean, 1 Sumn. 276, Fed. Cas. No. 229), is not doubted, and a "general visitatorial power over state corporations" has been expressly disclaimed in Hale v. Henkel, 201 U. S. 75, 26 Sup. Ct. 379, 50 L. Ed. 652. But, if a corporation engaged in occupations as to which its fundator efficiens or perficiens is wholly without authority, occupations which such founder cannot control or regulate, for which he cannot license and from which he cannot prevent the child of his creation, the visitatorial power of controlling or arresting abuses in respect of such occupations becomes wholly inefficient, and either that power or its equivalent must be lodged with the sovereign that can control the occupation so entered upon. That such power in respect of interstate and foreign commerce is lodged in the federal government I believe to be the declaration of the case last cited. 201 U. S. 75, 26 Sup. Ct. 379, 50 L. Ed. 652.

5. It would be a singular extension of the rule concerning privileged communications that permitted the identity of one depositing securities with a banker to be concealed by that merchant. The principle, if acknowledged, would screen one who had stolen what he so deposited. I believe In re Chapman, supra, to be conclusive authority against the contention. The privacy of papers, the private nature of a witness' knowledge, or the fact that disclosure may injure a third person, are not reasons for withholding facts pertinent and material to an investigation judicial or legislative, once the power to conduct the investigation be established. Interstate Commerce Commission v. Baird, 194 U. S. 25, 24 Sup. 563, 48 L. Ed. 860; Burnham v. Morrissey, 14 Gray (Mass.) 226, 74 Am. Dec. 676.

Mr. Kahn is directed to answer all the questions propounded, and Mr. Harriman all except those relating to purchase of Union & Southern Pacific stock in connection with the dividends of August, 1906.