UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT


No. 94-2262

CAROL SAWYER PARKS,

Plaintiff - Appellant,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION,
AS RECEIVER FOR OLYMPIC INTERNATIONAL
BANK AND TRUST COMPANY,

Defendant - Appellee.



APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Edward F. Harrington, U.S. District Judge] 



Before

Torruella, Chief Judge, 
Bownes, Senior Circuit Judge, 
and Selya, Circuit Judge. 



David G. Hanrahan, with whom Ross D. Ginsberg and Gilman, 
McLaughlin & Hanrahan, were on brief for appellant. 
Jaclyn C. Taner, Counsel, with whom Ann S. Duross, Assistant 
General Counsel, Colleen B. Bombardier, Senior Counsel, John P. 
Parker, Senior Attorney, and Juanita L. Dean, Counsel, were on 
brief for appellee, Federal Deposit Insurance Corporation.



September 13, 1995


TORRUELLA, Chief Judge. Plaintiff-appellant Carol TORRUELLA, Chief Judge. 

Sawyer Parks filed suit in the United States District Court for

Massachusetts to enjoin defendant-appellee Federal Deposit

Insurance Company ("FDIC") from enforcing a subpoena duces tecum 

seeking Parks' personal financial papers and records. The

district court granted the FDIC's motion to dismiss Parks'

complaint, and for summary enforcement of the subpoena. Parks'

appeal of that decision presents the following important

question: Does the Fourth Amendment's proscription against

unreasonable searches and seizures require the FDIC to articulate

some quantum of individualized suspicion of wrongdoing before

subpoenaing a citizen's private financial papers? Relying on the

Supreme Court's long-held distinction between the Fourth

Amendment rights accorded private -- as opposed to corporate --

papers, we answer in the affirmative. Because the district court

did not review the subpoena under the standard we announce today,

we reverse and remand for further proceedings consistent with

this opinion.

BACKGROUND BACKGROUND 

The FDIC insures deposits in financial institutions and

is authorized by statute to act as receiver for insured

institutions that fail and are closed by their chartering

authority. 12 U.S.C. 1811, 1821(c)(2) & (3). When the FDIC

is appointed receiver for a failed institution, it succeeds by

law to "all rights, titles, powers, and privileges" of the

institution's officers and directors with respect to the assets

-2-

of the institution. Id. at 1821(d)(2)(A). As a receiver, the 

FDIC is authorized to collect all obligations and moneys owed to

failed institutions for the benefit of the institution's

creditors and shareholders. Id. 1821(d)(2)(B). To facilitate 

this function, Congress has authorized the FDIC to issue

subpoenas and subpoenas duces tecum "for purposes of carrying out 

any power, authority, or duty with respect to an insured

depository institution (including determining any claim against

the institution and determining and realizing upon any assets of

any person in the course of collecting money due the

institution). . . ." Id. 1818(n), 1821(d)(2)(I)(i). The FDIC 

is empowered to avoid fraudulent transfers, assert claims against

directors and officers, and seek court orders attaching assets.

Id. 1821(d)(17), 1821(k), 1821(d)(18). In addition, Congress 

directs the FDIC, generally, to maximize the return for the sale

of assets, and to minimize losses. Id. 1821(d)(13)(E). 

Ms. Parks was a director of Olympic International Bank

and Trust Company ("Olympic") from May 1987 through July 1990.

On June 26, 1992, Olympic was declared insolvent and the FDIC was

appointed its receiver. On June 28, 1994, the FDIC issued an

Order of Investigation to determine whether (1) former directors

and officers may be liable as a result of any actions or failures

to act which may have affected Olympic; (2) pursuit of litigation

would be cost effective, considering the extent of the potential

defendants' ability to pay a judgment; (3) the FDIC should seek

to avoid a transfer of assets; and (4) the FDIC should seek an

-3-

attachment of assets.

On July 28, 1994, the FDIC issued a subpoena duces 

tecum to Ms. Parks requesting the following information:  

1. Your current financial statement and all
financial statements listing your assets and
liabilities, (alone or with others).

2. All financial statements of your spouse.

3. All credit applications submitted by you
or your spouse, alone or with others, to any
depository institution or any other person or
entity.

4. All records prepared, generated, or
received on or after August 1, 1993 through
August 1, 1994, referring or relating to the
source and amount of any income received by
you or on your behalf, including but not
limited to all wages, salary, commissions,
bonuses, interest and dividend payments, and
any other form of income received by you.

5. All federal, state and local tax returns
filed by you either individually or jointly
with another, along with all forms and
schedules filed with such returns from
January 1, 1989 through April 15, 1994.

6. All records prepared, generated, or
received from August 1, 1993 through August
1, 1994 which refer or relate to stocks,
bonds, securities or other investments
currently owned by individually or with
others, including but not limited to any
statements showing their value.

7. All documents that reflect, refer or
relate to any financial, real or personal
property transactions, including cash, in
which you, or anyone acting on your behalf,
or under your control or influence, have been
involved, (except as the attorney, employee
or agent of another party on transactions in
which you had no personal interest), having a
value of $5,000 or more, per person or
organization per year, including, but not
limited to, the following:

-4-

a. all real and personal property
purchases, sales or transfers, with or
without consideration;
b. all trust participants;
c. mortgages, trusts or other liens on
security interests obtained or supplied
to any third party;
d. lawsuits; and
e. repossessions and returns.

8. All documents referring or relating to
any transfer of assets exceeding $5,000 to
any entity, account, place or person located
outside the United States of America.

9. All records referring or relating to any
interest you hold in any real personal or
other type of property exceeding $5,000 in
value not described above.

10. All documents referring or relating to
any transfer or assets exceeding $5,000 to
any entity, account, place or person located
outside the United States of America.

11. All records referring or relating to any
interest you hold in any real personal or
other type of property exceeding $5,000 in
value not described above.

Ms. Parks refused to produce the information. Instead,

she filed a complaint for declaratory and injunctive relief in

the United States District Court for Massachusetts arguing, among

other things, that compelled production of the documents would

violate her rights under the Fourth Amendment. The FDIC filed a

motion to dismiss the complaint, and for summary enforcement of

the subpoena. On the same day that the FDIC filed its motion,

the district court, without the benefit of a hearing, or even a

response from Parks, granted the FDIC's motion to dismiss and for

summary enforcement of the subpoena. We granted Parks'

subsequent motion to stay enforcement of the subpoena pending

-5-

appeal.

-6-

DISCUSSION DISCUSSION 

Ms. Parks argues that the FDIC subpoena constitutes an

"unreasonable search" of her private financial papers in

violation of her rights under the Fourth Amendment. The Fourth

Amendment protects the "right of the people to be secure in their

persons, houses, papers, and effects, against unreasonable

searches and seizures . . . ." The Supreme Court has described

the subpoena as a "constructive" search, Oklahoma Press Pub. Co. 

v. Walling, 327 U.S. 186 (1945), which is therefore subject to 

Fourth Amendment limitations. Donovan v. Lone Steer, Inc., 464 

U.S. 408, 415 (1984); United States v. Morton Salt Co., 338 U.S. 

632, 651 (1950) ("[T]he 'right to be let alone -- the most

comprehensive of rights and the right most valued by civilized

men,' is not confined literally to searches and seizures as such,

but extends as well to the orderly taking under compulsion of

process . . . .") (citations omitted). It is beyond dispute that

Ms. Parks' has a "legitimate expectation of privacy" in her

privately held financial papers and records, and thus that her

Fourth Amendment rights are implicated by the FDIC's subpoena.

See United States v. Jacobsen, 466 U.S. 109, 113 (1984); Nixon v. 

Admin. of General Serv., 433 U.S. 425, 457-58 (1976) (President 

has legitimate expectation of privacy in his private papers).

Cf. United States v. Miller, 425 U.S. 435, 440-44 (1975) (no 

Fourth Amendment interest of depositor implicated because

financial papers ceased to be "private papers" when transferred

-7-

to bank).1

The question then becomes whether the subpoena issued

by the FDIC was "reasonable" within the meaning of the Fourth

Amendment. Florida v. Jimeno, 500 U.S. 248, 250 (1991) ("The 

touchstone of the Fourth Amendment is reasonableness."); United 

States v. Calandra, 414 U.S. 338, 354 (1974) ("The purpose of the 

Fourth Amendment is to prevent unreasonable governmental

intrusions into the privacy of one's person, house, papers, or

effects."). Our review of the relevant case law persuades us

that, although the FDIC met the lenient standard of

reasonableness for administrative subpoenas of corporate records, 

it failed to meet the stricter standard of reasonableness that

applies to administrative subpoenas of personal papers and 

records.

I. I.

The FDIC asserts that the only constraints on its power

to subpoena an individual's private financial papers are that the

investigation be within its authority, the subpoena be
 

1 The Supreme Court has recognized that:

Of all the rights of the citizen, few are
of greater importance or more essential
to his peace and happiness than the right
of personal security, and that involves,
not merely protection of his person from
assault, but exemption of his private 
affairs, books, and papers from the 
inspection and scrutiny of others. 
Without the enjoyment of this right, all
others would lose half their value.

Interstate Commerce Comm'n v. Brimson, 154 U.S. 447, 479 (1894) 
(citation and internal quotation marks omitted; emphasis added).

-8-

sufficiently definite, and the information reasonably relevant.2

The FDIC relies on our decision in United States v. Comley, 890 

F.2d 539, 541 (1st Cir. 1989), where we stated that:

In general, an agency subpoena is
enforceable if it is for a proper purpose
authorized by Congress, the information
sought is relevant to that purpose and
adequately described, and statutory
procedures are followed in the subpoena's
issuance. . . . "As long as the
investigation is within the agency's
authority, the subpoena is not too
indefinite, and the information sought is
reasonably relevant, the district court
must enforce an administrative subpoena."

Id. at 541 (internal citations omitted) (quoting EEOC v. Tempel 

Steel Co., 814 F.2d 482, 485 (7th Cir. 1987)). Comley, however, 

concerned corporate papers, not private papers. As explained

below, the Supreme Court has long recognized a distinction

between the two.

Comley relied on United States v. Powell, 379 U.S. 48, 

57-58 (1964), which concerned a challenge by a corporate taxpayer

to a request by the IRS to produce corporate tax records. In 

rejecting the taxpayer's contention that the IRS must establish

probable cause of wrongdoing as a prerequisite to judicial

enforcement of the request, the Powell Court relied on the two 

cases principally relied on here by the FDIC -- Oklahoma Press, 

327 U.S. 186 and Morton Salt 338 U.S. 632. Both cases involved 

corporate records, a fact the Supreme Court evidently considered
 

2 As noted previously, the FDIC is empowered to avoid fraudulent
transfers, assert claims against directors and officers, and seek
court orders attaching assets. Id. 1821(d)(17), 1821(k), 
1821(d)(18).

-9-

of paramount importance in analyzing the Fourth Amendment issue.

In Oklahoma Press, several newspaper publishing 

corporations challenged the right of a government agency to

judicial enforcement of subpoenas duces tecum for corporate 

records absent a showing of wrongdoing. In rejecting a probable

cause standard for issuance of an administrative subpoena, the

Court explained that because corporations are created by the

state, they "are not entitled to all of the constitutional

protections which private individuals have." Oklahoma Press, 327 

U.S. at 204-05. The court made it quite plain that its holding,

and the standard it established for enforcement of an

administrative subpoena duces tecum under the Fourth Amendment, 

was predicated on the fact that corporate, as opposed to private

papers were at issue.

Historically private corporations have
been subject to broad visitorial power,
both in England and in this country. And
it long has been established that
Congress may exercise wide investigative
power over them, analogous to the
visitorial power of the incorporating
state, when their activities take place
within or affect interstate commerce.
Correspondingly it has been settled that 
corporations are not entitled to all of 
the constitutional protections which 
private individuals have in these 
matters. 

Id. at 204-05 (footnotes omitted). 

The respondent corporations in Morton Salt challenged 

the Federal Trade Commission's ("FTC's") power to require them to

file reports indicating compliance with a federal court of

appeal's decree enforcing an FTC cease and desist order. In

-10-

language relied on heavily by the FDIC in this case, the Court

compared the subpoena power of an administrative agency "to the

Grand Jury, which does not depend on a case or controversy for

power to get evidence but can investigate merely on suspicion

that the law is being violated, or even just because it wants

assurance that it is not." Id. at 642-43. The comparison, 

however, was made in reference to the corporate respondent's

claim that the agency had invaded the court of appeals

jurisdiction, it had nothing to do with respondent's Fourth

Amendment claim.3 The Court made this clear: "Whether the

Commission has invaded any private right of respondents' we

consider under later rubrics. Our only concern under the present

heading is whether the Commission's order infringes prerogatives

of the court." Id. at 643. 

The Morton Salt Court did hold -- in the section of the 

opinion which actually concerned the Fourth Amendment -- that the

FTC need not establish wrongdoing by the respondent corporations

in order to subpoena their financial documents. The Court based

this decision on the fact that corporations do not merit the same

degree of Forth Amendment protections as private individuals.

While they may and should have
protection from unlawful demands made in
the name of public investigation,
corporations can claim no equality with 
individuals in the enjoyment of a right 
to privacy. They are endowed with public 
attributes. They have a collective
impact upon society, from which they
 

3 The above quoted language came under a section of the opinion
entitled "Invasion of Court of Appeals Jurisdiction".

-11-

derive the privilege of acting as
artificial entities.

Id. at 651-52 (emphasis added; internal citations omitted). 

We think the clear import of Oklahoma Press and Morton 

Salt is that the standard for judicial enforcement of 

administrative subpoenas of a private citizen's private papers is

stricter than that for corporate papers. Our research indicates

that the Supreme Court has never extended the lenient Morton Salt 

standard for administrative subpoenas of corporate records to

private records. Rather, the Court has always couched the

standard in the context of the corporate status of the subpoena

target.4 The FDIC argues that we should nevertheless apply the

lenient Morton Salt standard governing administrative subpoenas 

of corporate papers to subpoenas for private papers because three

federal appeals courts have recently done so. We find the cases

cited by the FDIC unpersuasive.

In Resolution Trust Corp. v. Walde, 18 F.3d 943 (D.C. 

Cir. 1994), the court implicitly held that the RTC is not

required to articulate an individualized suspicion of wrongdoing

when it subpoenas private records for determining liability,

 

4 For example, in Donovan, supra, the Court stated that, "when 
an administrative agency subpoenas corporate books or records, 
the Fourth Amendment requires that the subpoena be sufficiently
limited in scope, relevant in purpose, and specific in directive
so that compliance will no be unreasonably burdensome." 464 U.S.
at 415 (quoting See v. City of Seattle, 387 U.S. 541, 544 (1967) 
and citing Morton Salt, 338 U.S. at 652-53). 

-12-

avoiding asset transfers, and freezing assets. Id. at 946.5 

The court's discussion of this issue begins and ends with its

quoting of the Morton Salt standard for judicial enforcement of 

an administrative subpoena. The court completely ignores Morton 

Salt's sharp distinction between corporate and private papers. 

See id. at 946. Walde, then, is unpersuasive to the extent that 

it ignores the Supreme Court's explicit recognition in both

Oklahoma Press and Morton Salt that private financial papers 

deserve stricter Fourth Amendment protection than corporate

papers.

In In re McVane, 44 F.3d 1127 (2d Cir. 1995), the 

Second Circuit concluded that "although the Morton Salt case 

recognized that individuals enjoy greater rights of privacy than

do corporations, courts have nevertheless applied the lenient

Morton Salt test to administrative subpoenas seeking personal 

records." Id. at 1137. The court cited two cases as examples of 

this seemingly anomalous practice -- Walde and the Supreme 

Court's decision in United States v. Stuart, 489 U.S. 353 (1989). 

 

5 As noted previously, these three areas of investigation are
authorized by statute. The court held, however, that the RTC's
fourth asserted area of investigation -- determining the cost-
effectiveness of a potential lawsuit -- is not authorized by its
statutory directive to maximize the return for the sale of
assets, and to minimize losses. Id. at 949; 12 U.S.C.  
1821(d)(13)(E). The court therefore held that when issuing a
subpoena for this purpose, the RTC must demonstrate at least an
articulable suspicion of wrongdoing. Id. See also In Re McVane, 
44 F.3d 1127, 1139-40 (2d Cir. 1995) (holding that, absent at
least an articulable suspicion that a former director is liable
to the failed bank, determining the cost-effectiveness of
litigation is not a proper purpose for the issuance of a
subpoena).

-13-

As noted, Walde sheds little light on this subject because it 

ignores the Morton Salt Court's distinction between corporate 

documents and personal records. At least, however, Walde is on 

point; Stuart is not. 

Stuart concerned a treaty between the United States and 

Canada that obliged the United States to obtain and convey

information to Canadian authorities to assist them in determining

a Canadian taxpayer's income tax liability. The respondents were

Canadian citizens and residents who maintained bank accounts in

the United States. They challenged the authority of the IRS to

issue an administrative summons to their bank for their private

financial documents, pursuant to a request by Canadian

authorities, without first determining that the Canadian tax

investigation had reached a stage analogous to a domestic tax

investigation's referral to the Justice Department for criminal

prosecution. 489 U.S. at 357. The Fourth Amendment was never

raised as a defense by the respondent taxpayers; indeed, the

Fourth Amendment is never even mentioned in the Stuart opinion. 

The reason is manifest. Because the documents were located at

the bank, and had thus been exposed to third parties, the

respondents had no reasonable expectation of privacy, and,

consequently, no Fourth Amendment interest in the documents. See 

Securities and Exchange Comm'n v. O'Brien, Inc., 467 U.S. 735, 

743 (1984) (Fourth Amendment does not protect information

communicated to a third party); United States v. Payner, 447 U.S. 

727, 731-32 (1979) (no legitimate expectation of privacy in

-14-

documents voluntarily turned over to bank); United States v. 

Miller, 425 U.S. 435, 441-43 (1975) (depositor has no expectation 

of privacy and thus no "protectable Fourth Amendment interest" in

financial records retained by bank). Stuart thus provides no 

support for the proposition asserted here by the FDIC.

The FDIC also directs us to the Third Circuit's recent

decision in Federal Deposit Insurance Corp. v. Wentz, 1995 WL 

329921 (3d Cir. 1995). Wentz is the only administrative subpoena 

case we have found that contains more than a passing reference to

the distinction between corporate and private papers. Contrary

to the FDIC's assertions, however, we think it provides as much

support for Parks' position as that of the FDIC.

In Wentz, the court upheld an FDIC subpoena of the 

personal financial documents of former officers and directors of

a failed bank. The court began by citing the lenient Morton Salt 

test for enforcement of an administrative subpoena. The court

recognized, however, that "[w]hen personal documents of

individuals, as contrasted with business records of corporations,

are the subject of the subpoena, privacy concerns must be

considered." Id. at *2 (citing Whalen v. Roe, 429 U.S. 589, 599 

(1977)). The court then balanced the governmental need for the

information against the respondents' privacy interest in their

personal financial documents, and concluded that the public

interest in "safeguarding the FDIC's legislative mandate

outweighs the minimal intrusion into the privacy that surrounds

the directors' personal financial records . . . ." Id. at *4. 

-15-

Wentz recognized that subpoenas for privately held 

financial documents implicate privacy concerns and should

therefore be evaluated by a stricter standard than corporate

documents. As explained below, we agree with Wentz that the 

proper inquiry requires a balancing between the governmental need

to search and the privacy interests of the subpoena target.6 

Where we part company with Wentz is solely in the mechanics of 

the balancing itself. We address this issue below.7

II. II.

The FDIC asserts the power to rummage through the

financial papers of private citizens based on nothing more than

the hope that illegal conduct might be revealed. We do not think

that Ms. Parks waived her Fourth Amendment interest in her

private papers by serving on the board of directors of a

federally regulated bank. See In re Sealed Case, 42 F.3d at 

1418. Moreover, we think it inconceivable that the Framers of

the Constitution, who knew so well and cared so deeply about

arbitrary governmental interference in private citizen's affairs,

would countenance such unbridled power in the hands of an

administrative agency. See Camara v. Municipal Court, 387 U.S. 

523, 528 (1967) (the "basic purpose" of the Fourth Amendment "is
 

6 Interestingly, although Wentz did not explicitly state that 
the respondent's privacy interest derived from the Fourth
Amendment, the court posited what is essentially a Fourth
Amendment reasonableness test.

7 Other federal court of appeals cases cited by the FDIC are
inapposite because, like Comley, they concern corporate records. 
See, e.g., Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. RTC, 
5 F.3d 1508 (D.C. Cir. 1993).

-16-

to safeguard the privacy and security of individuals against

arbitrary invasions by government officials"). As Justice Holmes

observed:

Anyone who respects the spirit as well as
the letter of the Fourth Amendment would
be loath to believe that Congress
intended to authorize one of its
subordinate agencies to sweep all our
traditions into the fire and to direct
fishing expeditions into private papers
on the possibility that they may disclose
evidence of crime. We do not discuss the
question whether it could do so if it
tried, as nothing short of the most
explicit language would induce us to
attribute to Congress that intent.

Federal Trade Comm'n v. American Tobacco Co., 264 U.S. 298, 305- 

06 (1924) (citation omitted).8

The question that remains is what quantum of suspicion

should be required for judicial enforcement of an FDIC subpoena

of an individual's private financial papers. Since

reasonableness is the touchstone, our inquiry requires a careful

balancing of "the nature and quality of the intrusion on the

individual's Fourth Amendment interests against the importance of

the governmental interests alleged to justify the intrusion."

United States v. Place, 462 U.S. 696, 703 (1983); Camara, 387 

U.S. at 534-35 (1967). In this case there are compelling

 

8 The dissent relies heavily upon the fact that an
administrative subpoena, unlike a search in the criminal context,
is not self-executing. Whatever relevance this distinction may
have in the ordinary case, it surely has none in this one. As
noted previously, the district court granted the FDIC's motion to
dismiss, and for summary enforcement of the subpoena on the same
day the motion was filed. Ms. Parks thus never had an
opportunity to be heard on the motion, or even to respond to it.

-17-

interests on both sides. There is a strong public interest in

promptly resolving the affairs of insolvent banks on behalf of

their creditors and depositors. Moreover, the FDIC's legislative

mandate is clear with respect to avoiding fraudulent transfers,

attaching assets, and generally asserting claims against

directors and officers of failed financial institutions. 12

U.S.C. 1821(d)(17), 1821(d)(18), 1821(k). On the other hand,

private citizens have a significant expectation of privacy in

their personally held financial papers. Indeed, "papers" are

specifically listed in the text of the Fourth Amendment.

We think the significant public interest in resolving

the affairs of failed institutions, as reflected by the FDIC's

legislative mandate, deserves considerable weight. Consequently,

we conclude that the "balancing of governmental and private

interests suggests that the public interest is best served by a

Fourth Amendment standard of reasonableness that stops short of

probable cause." New Jersey v. T.L.O., 325 U.S. 334, 341 (1985). 

In such cases, the Supreme Court has often utilized a

reasonableness standard which requires the government to

articulate a reasonable suspicion of wrongdoing by the target of

the search. See, e.g., id. at 342; Delaware v. Prouse, 440 U.S. 

873, 881 (1979); United States v. Mart nez-Fuerte, 428 U.S. 648, 

654-55 (1976); United States v. Brignoni-Ponce, 422 U.S. 873, 881 

(1975); Terry v. Ohio, 392 U.S. 1 (1968). We think this standard 

strikes the appropriate balance between protecting private

citizens' private papers and enabling the FDIC to fulfill its

-18-

statutory mandate.9

The district court did not consider whether the FDIC

had articulated reasonable suspicion of wrongdoing by Ms. Parks.

Moreover, we think that the affidavit supplied by one of the

FDIC's investigators, which was on record at the district court,

does not provide such an articulable suspicion of wrongdoing.

The affidavit simply states that the bank lost over eight million

dollars as a result of several insider loans which were approved

or ratified by the directors of Olympic, including Parks, after

the bank had received regulatory warnings regarding its loan

practices. The investigator concludes that the nature and extent

of the losses suggests that the directors "were grossly negligent

and violated their fiduciary duty of loyalty to Olympic in making

the insider loans."

The affidavit articulates a generalized suspicion of

wrongdoing by the bank directors, but fails to articulate the

required individualized suspicion of wrongdoing by the target of

the subpoena, Ms. Parks. Cf. Ybarra v. Illinois, 444 U.S. 85, 

 

9 In conducting this balancing, the Wentz court, supra, 
apparently concluded that the FDIC need not articulate any
quantum of suspicion because the targets of the subpoena had not
shown that the information contained in their personal financial
records was of such a sensitive nature that they were "likely to
suffer any adverse effects from disclosure." Wentz, 1995 WL 
329921, at *4 (quoting United States v. Westinghouse Elec. Corp., 
638 F.2d 570, 578 (3d cir. 1980)). But once it is conceded, as
it must be, that a citizen has a legitimate expectation of
privacy in privately held financial papers, see supra, the 
question is not whether the individual will suffer adverse
effects from disclosure, but whether the government has shown 
adequate justification for searching the documents. This, one
would think, is the whole point of the Fourth Amendment.

-19-

93, 97 (1980); United States v. Lott, 870 F.2d 778, 783 (1st Cir. 

1989). See also United States v. Jaramillo, 25 F.3d 1146, 1150 

(2d Cir. 1994) ("any invasion of a person's Fourth Amendment

interests must be justified at least by 'specific and articulable

facts' directed to the person whose interests are to be

invaded"). Similarly, in McVane, the court rejected an FDIC 

subpoena of certain former directors' familial records because

the FDIC affidavit stated only that another director has

transferred assets to family members. The court reasoned that

"the FDIC has articulated no grounds for suspecting that any of

these Directors (as opposed to the unnamed 'other former 

director') has transferred assets to family members." McVane, 44 

F.3d at 1139.

The FDIC has not shown that Parks received an insider

loan or otherwise benefited from such a loan to another director.

Cf. Resolution Trust Corp. v. Adams, 869 F. Supp. 1, 3 n.4 

(D.D.C. 1994) (respondent directors paid themselves approximately

$8 million in preferred dividends of the failed institution).

Nor has the FDIC shown "a suspicious asset transfer or a

questionable payment by the target, or deposition testimony of

other former officers and directors" casting suspicion upon

Parks. Walde, 18 F.3d at 949. Cf. In Re Sealed Case, 42 F.3d at 

1417 (finding articulable suspicion due to respondent directors

involvement in unusual transfers "between two companies that they

owned within a bank that they controlled"). Under a reasonable

suspicion standard, if the FDIC has no "specific basis . . . upon

-20-

which to suspect that the target engaged in wrongdoing, then the 

subpoena cannot be enforced." Walde, 18 F.3d at 949 (emphasis 

added). Based on the current record, we conclude that the FDIC

has failed to articulate specific facts for suspecting that Ms.

Parks has engaged in any wrongdoing with respect to her role as a

director of Olympic. Until the FDIC can do so, the Fourth

Amendment dictates that her privately held financial papers are

just that -- private.10

CONCLUSION CONCLUSION

The Fourth Amendment requires that the FDIC articulate

an individualized suspicion of wrongdoing by the petitioner as a

prerequisite to judicial enforcement of a subpoena duces tecum 

seeking her privately held financial documents. The judgment of

the district court is therefore reversed, and the case remanded 

for further proceedings to determine whether the FDIC can in fact

meet this standard.

-- Dissenting Opinion follows --

 

10 Of course, petitioner cannot assert any privacy claim with
respect to any documents that she has already disclosed to the
public. See Nixon, 425 U.S. at 459 (citing United States v. 
Dionisio, 410 U.S. 1, 14 (1973)). 

-21-

SELYA, Circuit Judge (dissenting). I believe that this SELYA, Circuit Judge (dissenting). 

case is less exotic than the majority suggests. The FDIC, acting

within its statutory authority, 12 U.S.C. 1821(d), issued an

order of investigation to determine, inter alia, whether former 

directors and officers of a failed bank, Olympic International

Bank and Trust Co., may be liable as a result of any acts or

omissions affecting Olympic. The agency then directed an

administrative subpoena to appellant Parks (a former Olympic

director). The record makes manifest that the agency issued this

subpoena in good faith and for a statutorily permitted purpose.

The majority concedes, ante at 7, that the subpoena "met the 

lenient standard of reasonableness" imposed on administrative

subpoenas under longstanding case law. In my view, these

validations are sufficient. Precedent does not support the

additional limitation that the majority today unveils, the

Constitution does not require that limitation, and policy

considerations counsel against its imposition.

A A

In the first place, the majority's position is

completely unprecedented. An administrative subpoena is not

self-executing and is, therefore, not itself a search; it is a

direction to produce documents and/or testimony, subject to

judicial review should the subpoenaed party balk. See Oklahoma 

Press Pub. Co. v. Walling, 327 U.S. 186, 195, 202 (1945); In re 

Grand Jury Subpoena Served Upon Simon Horowitz, 482 F.2d 72, 75- 

79 (2d Cir.) (Friendly, J.), cert. denied, 414 U.S. 867 (1973). 

-22-

In other words, a person upon whom an administrative subpoena is

served unlike a person subjected to, say, an actual search or a

Terry stop has an opportunity to quash the subpoena before 

producing the information.

At that stage, of course, the Fourth Amendment can be

interposed as a bar to enforcement of the subpoena. See Donovan 

v. Lone Steer, Inc., 464 U.S. 408, 415 (1984). Until today, 

however, no modern federal appellate court has ever held that an

administrative subpoena which satisfies the traditional four-part

test (that is, a subpoena issued after all appropriate

administrative steps have been taken, for a proper purpose,

seeking information that is relevant to that purpose and which is

not within the agency's possession) is unenforceable or subject

to curtailment solely on the ground that it implicates "personal

financial records" as opposed to "corporate records." The

decisions with which I am familiar run uniformly to the contrary.

See, e.g., RTC v. Frates, F.3d , (D.C. Cir. 1995) 

[1995 WL 471777 at *3] (rejecting articulable suspicion standard

for enforcing RTC subpoena of personal financial records); In re 

McVane, 44 F.3d 1127, 1136 (2d Cir. 1995) (similar); RTC v. 

Walde, 18 F.3d 943, 946-47 (D.C. Cir. 1994) (similar); SEC v. 

Knopfler, 658 F.2d 25, 26 (2d Cir. 1981) (enforcing, on standard 

showing for administrative subpoenas, SEC subpoena issued to

individuals for personal financial records relating to potential

insider trading), cert. denied, 455 U.S. 908 (1982). 

The majority, without citing a single case on point,

-23-

abruptly departs from this established precedent. The upshot is

to create a singular benchmark against which certain

administrative subpoenas henceforth will have to be evaluated in

the First Circuit and only in the First Circuit. I am

unwilling to venture along this rocky coast simply to answer a

siren's call.

B B

My principal substantive objection to the majority's

approach is to the notion that the Fourth Amendment distinguishes

between "personal financial records" and "corporate records" with

regard to administrative subpoenas. To be sure, language

faithfully quoted by the majority suggests that, in an earlier,

more genteel era, the Supreme Court took care to confine its

rulings to the exigencies of the particular administrative

subpoena cases then before it but those cases, whether read

individually or in the ensemble, do not constitute anything

approximating a conclusive holding that the privacy interest in

personal financial records must always be accorded greater

respect than a corporation's privacy interest in its records.

Indeed, I read the language on which the majority relies as

denoting nothing more than that the Court desired at the time to

keep the question open. And more recent developments in the law

have blurred whatever distinction these earlier cases may have

sought to preserve.

The proof of the pudding is the long line of cases

starting with United States v. Powell, 379 U.S. 48 (1964) cases 

-24-

that repeatedly have sanctioned the authority of a particular

agency, the Internal Revenue Service (IRS), to issue summonses

for either personal or corporate records on the minimal showing

that the majority today explicitly rejects. See id. at 57-58 

(explaining that the IRS need only "show that the investigation

will be conducted pursuant to a legitimate purpose, that the

inquiry may be relevant to the purpose, that the information

sought is not already within the [IRS's] possession, and that the

administrative steps required by the Code have been followed").

Though Powell itself dealt with a corporate taxpayer, it is 

transpicuously clear that the Powell standard applies to the 

production of private financial papers and records of

individuals, that is, to the production of records pertaining to

economic or fiscal activity (which, for simplicity's sake, I will

henceforth call financial records). See, e.g., Ryan v. United 

States, 379 U.S. 61, 62 (1964) (upholding IRS summons to 

individual taxpayer "for the reasons given in United States v. 

Powell"); United States v. McAnlis, 721 F.2d 334, 336-37 (11th 

Cir. 1983), cert. denied, 467 U.S. 1227 (1984); United States v. 

Roundtree, 420 F.2d 845, 847-51 (5th Cir. 1969). 

The Powell standard remains both the law of the land, 

see, e.g., Tiffany Fine Arts, Inc. v. United States, 469 U.S. 

310, 323 (1985), and the law of this circuit, see, e.g., Copp v. 

United States, 968 F.2d 1435, 1437 (1st Cir. 1992), cert. denied, 

113 S. Ct. 1257 (1993). What is more, Powell is the building 

block around which, up to now, our modern administrative subpoena

-25-

jurisprudence has been constructed. See, e.g., United States v. 

Comley, 890 F.2d 539, 541 (1st Cir. 1991) (citing Powell and 

applying Powell principles to administrative subpoena issued by 

the Nuclear Regulatory Commission); SEC v. Howatt, 525 F.2d 226, 

229 (1st Cir. 1975) (same, with respect to subpoena issued by the

SEC). There is no valid reason why this standard, undiluted,

should not apply here. If Congress can authorize the IRS to

issue summonses calling for the production of personal financial

records on such a bareboned showing without running afoul of the

Fourth Amendment, then it is clear to me that Congress can

authorize other agencies to do the same. The cases and the

commentators bear witness to this verity. See, e.g., SEC v. 

Kaplan, 397 F. Supp. 564, 570 (E.D.N.Y. 1975) (enforcing subpoena 

issued by SEC for personal financial records of an individual);

Wayne R. LaFave, Search & Seizure 4.13(e), at 383 (2d ed. 1987) 

(acknowledging rule).

Believing, as I do, that an individual has no greater

(legitimate) expectation of privacy in her financial records than

does a business, I see no reason to conduct the kind of balancing

that the majority covets in order to test the reasonableness of

an administrative subpoena that seeks the production of personal

financial records. Oklahoma Press and Morton Salt, read together 

with the Powell-Ryan line of cases, lead inexorably to the 

conclusion that, to borrow a leaf from Gertrude Stein's book,

financial records are financial records are financial records.

This conclusion holds true whether the records belong to an

-26-

individual or to an enterprise, and administrative subpoenas

seeking such records are per se reasonable a long as they are

lawfully authorized, relevant, sufficiently specific, and

procedurally unblemished.

Let me be perfectly clear. I do not suggest that the

minions of an administrative agency can roam at will, like a herd

of zebra on the veldt, through an individual's personal papers or

effects. I am open to the idea that there may be a heightened

privacy interest in certain non-business records (e.g., personal

diaries, letters, medical records, and the like) requiring, in

turn, a more finely calibrated balance between public and private

interests before a court lawfully can order such records produced

in response to a summons. See, e.g., FDIC v. Wentz, 55 F.3d 905, 

908 (3d Cir. 1995); see generally LaFave, supra, at 383 

(suggesting that, "[i]n the case of private individuals, perhaps

the mere relevance standard is sufficient to protect privacy

interests in documents related to economic activity, but arguably

purely private papers should be protected by requiring the

investigatory body to meet a more stringent standard").

Recognizing, however, that "[w]e are not so outraged by the

intrusion on privacy that accompanies the seizure of [financial]

records as we are by the seizure of a diary," Couch v. United 

States, 409 U.S. 322, 350 (1973) (Marshall, J., dissenting), I 

discern no constitutional impediment to the administrative

subpoena that the FDIC served on Parks. Since the record shows

conclusively that the FDIC issued the subpoena for a legitimate

-27-

purpose (an investigation into, inter alia, whether Parks may be 

liable to the FDIC),11 that the inquiry is relevant to that

purpose, that the information requested is not already within the

agency's ken, and that the necessary procedural bases were

touched, the subpoena should be enforced.

C C

Apart from the fact that the majority's brand-new

standard is unmoored both from precedent and from the Fourth

Amendment, the standard also fares poorly on policy grounds. I

will not dwell on this aspect, except to note that the rule

envisioned in the majority opinion is inconsistent with the bases

of the modern administrative state.

Administrative investigations differ significantly from

criminal investigations: government agencies typically

investigate in order to enforce compliance with complicated

structures of economic regulation. The ability to obtain

information from regulated parties and those persons in privity

with them typically is vital to the success of the regulatory

scheme. See United States v. Morton Salt Co., 338 U.S. 632, 642 

(1950); Oklahoma Press, 327 U.S. at 216; Stephen G. Breyer & 

Richard B. Stewart, Administrative Law & Regulatory Policy 975 

(2d ed. 1985). And it is a fact of life that agencies charged
 

11 In this instance, it is immaterial that the FDIC's order of
investigation listed other objects as well. See ante at 3. The 
requirement that an administrative subpoena must be issued for a
proper purpose is satisfied in the case of a multi-purpose
subpoena as long as any one of the underlying purposes is proper.
See Tiffany Fine Arts, 469 U.S. at 324; FTC v. Carter, 636 F.2d 
781, 789 (D.C. Cir. 1980).

-28-

with regulating economic activity often cannot articulate

probable cause or even reasonable suspicion that a violation has

transpired without first examining documents reflecting a party's

economic activity. See Kenneth C. Davis & Richard J. Pierce, 

Jr., Administrative Law Treatise 4.1, at 138 (3d ed. 1994). 

This incipient problem the need to hitch the horse in front of

the cart is frequently exacerbated because the subpoena power

has great significance for most administrative agencies in the

conduct of important public business.

Partially for that reason and partially out of a

concern for separation of powers it is trite but true that the

Judicial Branch must respect the Executive Branch's prerogatives

to enforce the laws, see, e.g., Howatt, 521 F.2d at 229 the 

courts historically have had a very circumscribed role in the

oversight of administrative subpoenas. See, e.g., Morton Salt, 

338 U.S. at 642-43; EEOC v. Bay Shipbuilding Corp., 668 F.2d 304, 

308-09 (7th Cir. 1981); Goodyear Tire & Rubber Co. v. NLRB, 122 

F.2d 450, 451 (6th Cir. 1941). To this end, judicial proceedings

regarding the enforcement of such subpoenas are intended to be

relatively informal and summary in nature. See Donaldson v. 

United States, 400 U.S. 517, 529 (1971); Bay Shipbuilding, 668 

F.2d at 309. The court's sole function is to ensure that a

subpoena is issued for a proper purpose and in compliance with

the law. See Comley, 890 F.2d at 541; FTC v. Texaco, Inc., 555 

F.2d 862, 872 (D.C. Cir.) (en banc), cert. denied, 431 U.S. 974 

(1977). By handing the targets of agency investigations a potent

-29-

new weapon, cf. SEC v. Jerry T. O'Brien, Inc., 467 U.S. 735, 750 

(1984) (rejecting a notice requirement for third-party SEC

subpoenas in part because it "would substantially increase the

ability of persons who have something to hide to impede

legitimate investigations by the Commission"), the majority

facilitates the insertion of monkey wrenches into the

administrative machinery, and creates the potential not only for

delaying agency probes (thereby further eroding agency

effectiveness), but also for increasing the extent of judicial

intrusions into the agency sphere.

It is clear that Congress feared these very dangers.

Having written the FDIC's organic statute broadly, requiring the

agency to assess the conduct of officials employed by or

affiliated with federally insured banks from a variety of

different perspectives, most of which relate to the governmental

interest in minimizing the public's exposure to financial loss,

Congress vested generous, easily enforceable subpoena power in

the FDIC so that the agency could pursue its public mission. See 

H.R. Rep. No. 681(I), 101st Cong., 2d Sess. 170, 186 (1990),

reprinted in 1990 U.S.C.C.A.N. 6472, 6576, 6592. Without the 

ability to use this power as Congress intended including the

ability to subpoena individuals' personal financial records based

on relevance and nothing more the FDIC likely will be hamstrung

in its efforts to perform the full range of its statutory

responsibilities. Thus, the majority's suggested standard

(which, as I have explained, is mandated neither by precedent nor

-30-

by constitutional doctrine) unaccountably undermines the ability

of the FDIC and every other administrative agency to do

Congress's bidding, and thereby frustrates the congressional will

for no good reason.12 See Federal Maritime Comm'n v. Port of 

Seattle, 521 F.2d 431, 433 (9th Cir. 1975) (explaining that the 

"very backbone of an administrative agency's effectiveness in

carrying out the congressionally mandated duties of industry

regulation is the rapid exercise of the power to investigate").

D D

Because I am convinced that my colleagues are

needlessly infringing upon the lawful powers of administrative

agencies, and because I fear the mischief that this well-

intentioned effort to resurrect a moribund view of the Fourth

Amendment may produce, I respectfully dissent.

 

12 This does not mean, of course, that I endorse, as a matter of
policy, either the FDIC's penchant for riding roughshod or its
aggressive use of administrative subpoenas. But the rule of law
requires judges to subrogate such personal reservations to
precedent and reason. After all, constitutional adjudication
"must be an overriding judgment founded on something much deeper
and more justifiable than personal preference." Sweezy v. New 
Hampshire, 354 U.S. 234, 267 (1957) (Frankfurter, J., 
concurring).

-31-